BOGGS, J., delivered the opinion of the court, in which CLAY, J., joined and MOORE, J., concurred in the judgment. MOORE, J. (pp. 490-505) delivered a separate concurring opinion.
OPINION
BOGGS, Circuit Judge.
This appeal arises from a jury trial in which the three defendants were convicted of conspiracy to kill and maim persons outside the United States, in violation of 18 U.S.C. § 956(a)(1), and of conspiracy to provide material support to terrorists in furtherance of the killing of U.S. nationals, in violation of 18 U.S.C. § 2339A. In addition, Amawi and El-Hindi were each convicted of two counts of distributing information regarding the manufacture of explosives, destructive devices, and weapons of mass destruction, in violation of 18 U.S.C. § 842(p)(2)(A). Amawi, El-Hindi, and Mazloum were sentenced to below-Guidelines-range terms of 240, 144, and 100 of months of imprisonment, respectively.
There are ten issues on appeal. First, the defendants challenge the district court’s decision, pursuant to the Classified Information Procedures Act and Foreign Intelligence Surveillance Act, to delete classified information from discovery. Second, the defendants challenge the sufficiency of the evidence underlying their convictions. Third, the defendants object that their expert witnesses- — who would have testified about Islamist culture and social norms in the Middle East — should not have been excluded from testifying. Fourth, Amawi appeals the district court’s denial of his motion to delay the trial. Fifth, the defendants challenge the district court’s decision not to provide their requested jury instruction concerning the First Amendment. Sixth, El-Hindi appeals the district court’s denial of his motion for acquittal as a matter of law based on an entrapment defense. Seventh, Mazloum appeals the district court’s denial of his motion to dismiss the indictment against him based on an outrageous-conduct defense. Eighth, Amawi claims that his Miranda rights were violated after his arrest in Jordan while he was being interrogated onboard a jet flying back to the United States. Ninth, the government cross-appeals the sentences imposed, contending that they are both procedurally and substantively unreasonable. Tenth, Amawi appeals the district court’s denial of his motion for a new trial based on allegations of newly discovered evidence regarding the alleged identity of a Syrian contact.
We affirm all opinions and judgments of the district court.
I. Facts
This case concerns the actions of defendants Mohammad Amawi, Marwan ElHindi, and Wassim Mazloum in connection *466 with Darren Griffin, a paid informant for the FBI. After the attacks of September 11, 2001, the FBI assigned Griffin to embed himself in the Muslim community in Toledo, Ohio. Griffin enrolled in classes at a local mosque and obtained employment with a Muslim charity. Griffin described himself as an “ex-Green Beret, disenchanted with the United States[, who] did not agree with [American] foreign policy.”
Griffin’s contact with El-Hindi began in September 2002. El-Hindi approached Griffin after meeting him at a mosque and asked about the feasibility of kidnaping an Israeli soldier or politician. Over the next two years, Griffin developed a relationship with El-Hindi. Griffin expressed an interest in training others for “jihad” and said he would create a security company as a front. In June 2004, El-Hindi informed Griffin that he had wanted Griffin to train him and “two recruits” (Khaleel Ahmed and his cousin, Zubair Ahmed) as “Islamic extremists for jihad.” Griffin spoke with the Ahmeds by phone, but the training never materialized.
Griffin first encountered Amawi at the same mosque where he met El-Hindi. On June 30, 2004, Griffin went to Amawi’s home. Griffin stated that he wanted to fight for jihad against American forces in Iraq. Amawi also expressed a desire to fight with the jihadists and martyr himself, though he said the “conditions for jihad” were not right in Iraq. On October 14, 2004, the pair again met at Amawi’s home. Griffin showed Amawi various videos concerning fundamentalist Islamist terrorism, Usama Bin Laden, and the attacks on the Pentagon and the World Trade Center.
On October 21, 2004, Amawi suggested to Griffin the possibility of recruiting Mazloum for jihad training. Amawi arranged a meeting with Mazloum and Griffin on October 24, 2004. At this meeting, Mazloum agreed to participate in Griffin’s planned jihad training — including bomb-making, weapons training, and certain paramilitary tactics. On November 17, 2004, Amawi brought Mazloum to Griffin’s apartment.
On November 23, 2004, and December 13, 2004, Griffin visited Amawi’s apartment, where the two watched jihadist videos. Amawi expressed admiration for a sniper in a video who claimed to have killed two Americans. On January 10, 2005, Griffin and Amawi watched more jihadist videos at Amawi’s home, including a video demonstrating how to construct a bomb vest. On January 20, 2005, Griffin offered to provide Amawi with firearm instructions after Amawi indicated that he declined an opportunity to travel to Iraq due to his lack of training. The next day the pair met at a shooting range, where Griffin trained Amawi in the use of handguns. Amawi and Griffin met several times between January 27 and January 30, 2005. Griffin suggested that they provide laptops to “brothers” in Iraq, and Amawi agreed to transfer jihadist materials that Amawi had obtained onto CDs to provide instruction to the jihadists.
On February 2, 2005, Griffin brought El-Hindi to Amawi’s apartment. This was the first time Amawi and El-Hindi met. The trio watched jihadist videos. El-Hindi, watching a video about explosives, stated that “we will work with some of that stuff’ and asked Amawi for a copy of the videos. On February 6, 2005, Griffin met Amawi at Amawi’s apartment and asked him to transfer jihadist videos to Griffin, including the video about building a bomb vest. On February 8, 2005, Griffin met El-Hindi at his home. El-Hindi showed Griffin where he could download jihadist videos from the internet.
On February 14, 2005, El-Hindi and Griffin met Amawi at his office at AZ Travel. After Griffin suggested that they recruit other “brothers” for training, *467 Amawi suggested that they recruit Wassim Mazloum and Mazloum’s brother. On February 16, 2005, Griffin met Mazloum at Amawi’s apartment, and the trio traveled to El-Hindi’s home. This was the first and only time that all four were present together. After they all arrived, Griffin explained that he would train them but that they would have to pretend to be working for his security firm. Mazloum stated that he was ready for jihad training and expressed an interest in going to Iraq. Amawi suggested he knew another person who could be recruited and expressed an interest in going to Jordan or Iraq. ElHindi offered to seek grants to fund the operation. The quartet agreed to begin training regardless of whether others could be recruited. El-Hindi sought sniper training. Mazloum said that he wanted to learn how to make bombs. Amawi thought it was important to learn how to make explosives and sought sniper training. Griffin offered to start with handgun training and stated that it was not practical to begin with explosives. The group then watched a series of jihadist videos. The four never met together after this meeting.
On February 18, 2005, El-Hindi gave Griffin an email from “Just Jeans,” a company El-Hindi thought was a cover for a jihadist website. One week later, on February 26, 2005, El-Hindi and Griffin met again át El-Hindi’s home. El-Hindi showed Griffin photos of the placement of a battery-detonated improvised explosive device (“IED”) used to destroy U.S. military vehicles.
On March 14, 2005, Griffin and Amawi met at AZ Travel, and Amawi said that he was anxious to travel to Jordan — his lack of training was the only reason holding him back and preventing him from joining the jihad immediately.
Griffin met with El-Hindi on March 20, 2005. El-Hindi stated that he was preparing a grant to obtain funding for their training. The pair met with Jihadi Dahabi, an accountant, on April 4, 2005, to prepare fraudulent “educational” grants that would be used to finance jihad training.
On April 7, 2005, Amawi told Griffin that someone in “Syria” wanted to know if they could supply a “chemical thing” for the “brothers.” Griffin figured out that the chemical in question was Astrolite, an explosive. Griffin offered to send laptop computers he had to Syria to help the brothers fighting in Iraq. On April 11, 2005, Griffin told Amawi that he had an Astrolite supplier in Kuwait. On April 13, 2005, Amawi and Mazloum met at Griffin’s home. Griffin showed them how to properly align the sight on a pistol. Griffin explained the course of training he would provide. Amawi expressed an interest in learning how to manufacture IEDs. Amawi and Griffin decided that Amawi’s contact in Syria should deal directly with Griffin’s contact in Kuwait regarding the Astrolite. The next day, after Griffin expressed concern over discussing the Astrolite in front of Mazloum, Amawi said that Mazloum could be trusted.
On April 20, 2005, Griffin took Amawi and Mazloum to a shooting range. During the trip, Amawi again asked about IED training. Mazloum and his brother again joined Griffin and Amawi at the shooting range on April 29, 2005. Mazloum and Amawi again asked about explosive training. On May 1, 2005, Amawi told Griffin that he believed he was being followed. The next day Amawi, Griffin, and Mazloum purchased paintball equipment for tactical training.
On May 18, 2005, Amawi told Griffin that he intended to go to Jordan. On July 27, 2005, Griffin told Amawi that he had to *468 travel to the Middle East for business and offered to buy Amawi a ticket. Amawi accepted the offer. The pair met again on August 15, 2005, to finalize plans for the trip. They sought to provide laptops loaded with videos for jihadists going to Iraq.
On August 22, 2005, Griffin and Amawi traveled to Jordan, carrying six computers and a satellite phone that the FBI gave to Griffin. While in Jordan, the pair stayed with Amawi’s family. Amawi introduced Griffin to several of his “trusted brothers.” Griffin departed alone for the United States on September 8, 2005, leaving the satellite phone and one of the laptops. After his return, Mazloum asked Griffin whether he and Amawi had made “connections” with the “brothers, the mujahideen in Iraq.”
On December 13, 2005, Griffin returned to Jordan, bringing, at Amawi’s request, Amawi’s desktop computer and three CDs containing jihad training videos. Griffin stayed with Amawi’s family. Griffin departed alone on December 26, 2005. Upon Griffin’s return, Mazloum again asked him, on January 30, 2006, whether he had made any connections with the “brothers over in Iraq” on his trip.
On February 17, 2006, the FBI contacted Griffin and told him to leave his apartment at once. His service as an informant was terminated, and his identity would soon become publicly known. On February 19, 2006, FBI agents flew to Jordan and arrested Amawi. The agents placed him on a jet. During the flight, Amawi was interrogated and made inculpatory statements.
II. Classified Proceedings
The United States’s case-in-chief presented to the jury did not contain any classified information. Thus, this court’s review — with respect to the sufficiency of evidence supporting the conviction, the admissibility of expert testimony, the denial of a motion for a continuance, claims of entrapment and outrageous conduct, the violation of Amawi’s Miranda rights, the sentences, and Amawi’s motion for a new trial — is based entirely on the unclassified record. However, the defendants raise several arguments with respect to information that the district court examined and withheld from discovery under the Classified Information Procedures Act and the Foreign Intelligence Surveillance Act. Further, Amawi, Mazloum, and El-Hindi contend that the district court judge erred by conducting ex parte proceedings with the United States — both before and during the trial. Finally, defense counsel fault the United States for failing to process their security clearance applications. Following our review of the entire classified record, we find that the defendants’ claims are without merit.
A. The Classified Information Procedures Act
The Classified Information Procedures Act (CIPA), 18 U.S.C.App. 3, provides a set of procedures for federal courts to follow when the government seeks to protect classified information from disclosure. The sections of CIPA are arranged in sequence based on the flow of litigation. Initially, section 2 provides that after the filing of the indictment, the government may move for a pretrial conference to “consider matters relating to classified information that may arise in connection with the prosecution.” 18 U.S.C.App. 3 § 2. Next, under section 3, “[u]pon motion of the United States, the court shall issue an order to protect against the disclosure of any classified information disclosed by the United States.” 18 U.S.C.App. 3 § 3. Section 4 governs what classified information can be protected by the United States from discovery:
*469 The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.
18 U.S.C.App. 3 § 4. Section 5 — which is not at issue in this case — -provides the process if the “defendant reasonably expects to disclose or to cause the disclosure of classified information.” Section 6 of CIPA provides procedures for cases that involve classified information:
Within the time specified by the court for the filing of a motion under this section, the United States may request the court to conduct a hearing to make all determinations concerning the use, ■relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding. Upon such a request, the court shall conduct such a hearing. Any hearing held pursuant to this subsection (or any portion of such hearing specified in the request of the Attorney General) shall be held in camera if the Attorney General certifies to the court in such petition that a public proceeding may result in the disclosure of classified information. As to each item of classified information, the court shall set forth in writing the basis for its determination. Where the United States’ motion under this subsection is filed prior to the trial or pretrial proceeding, the court shall rule prior to the commencement of the relevant proceeding.
18 U.S.C.App. 3 § 6.
On March 23, 2006, the United States moved for a protective order under section 3 of CIPA, and the district court entered an order on July 17, 2006. On September 14, 2007, the United States filed a notice of intent to use information derived under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. § 1806. Relying on the authority of section 6, the district court conducted a series of ex parte hearings with the United States for purposes of reviewing the classified documents and considering the government’s claims under CIPA and FISA. The district court also conducted ex parte hearings with defense counsel to learn about their defense theories and how any classified information might be helpful or necessary to the defense. On May 15, 2009, in denying a motion for a new trial, the district court held that it had conducted the ex parte hearings in conformance with CIPA and FISA.
B. Deleting Evidence From Discovery Under CIPA
1. Precedents
The leading case construing whether courts can permit the government to withhold evidence from discovery under CIPA § 4 is United States v. Yunis, 867 F.2d 617 (D.C.Cir.1989). There, the District of Columbia Circuit held that evidence that “is relevant and helpful to the defense” cannot be withheld. Id. at 622 (quoting Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (internal quotation *470 marks omitted)). The court looked to three factors to determine whether classified information should be disclosed. First, the court must assess whether the information “crosse[s] the low hurdle of relevance.” Id. at 623. Second, the court must determine whether “the assertion of privilege by the government is at least a colorable one.” Ibid. Third, because “classified information is not discoverable on a mere showing of theoretical relevance ... [,] the threshold for discovery in this context further requires that [the information] ... is at least ‘helpful to the defense of [the] accused.’” Ibid, (quoting Roviaro, 353 U.S. at 60-61, 77 S.Ct. 623) (emphases added).
The “relevant and helpful” standard was adopted by several other circuits in ensuing cases. See, e.g., United States v. Aref, 533 F.3d 72, 79-80 (2d Cir.2008); United States v. Moussaoui, 382 F.3d 453, 472 (4th Cir.2004); United States v. Klimavicius-Viloria, 144 F.3d 1249, 1261 (9th Cir.1998); United States v. Varca, 896 F.2d 900, 905 (5th Cir.1990); United States v. Smith, 780 F.2d 1102, 1107 (4th Cir.1985).
Quite recently, in United States v. Hanna, 661 F.3d 271, 295 (6th Cir.2011), we joined those circuits. In accordance with that holding and the other courts that have considered this issue, we now apply the Yunis “relevant and helpful” standard.
2. Standard of Review
The defendants and the United States disagree about the appropriate standard of review. They both agree that this court’s review of whether the district court can conduct ex parte hearings is a question of law reviewed de novo. See United States v. Dumeisi, 424 F.3d 566, 578 (7th Cir.2005). However, they disagree with respect to the appropriate standard of review of the district court’s decision to delete certain classified items from discovery.
The United States contends that this court should review only for abuse of discretion. Defendants counter that 'the district court’s CIPA rulings should be reviewed de novo because the district court articulated two different rationales to exclude the classified evidence — the Brady v. Maryland standard, and the general Yunis standard. The defendants assert that the district court erred by incorrectly applying the general standard for disclosure under Brady rather than the stricter standard for withholding classified information set out in Yunis. Under Brady, “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (emphasis added).
These are two separate inquiries. First, to the extent that the district court applied an incorrect legal standard (Brady — which is less favorable to the defendant — rather than Yunis), then de novo would be the appropriate standard of review to ascertain an error in law. Second, beyond the application of the appropriate legal standard, this court reviews for an abuse of discretion the district court’s decision to delete evidence from discovery based on the Yunis “relevant and helpful” standard.
3. Section 4 Analysis
The district court, at several junctures, interchangeably applied the Brady and the Yunis standard. Cf. United States v. Mejia, 448 F.3d 436, 456 (D.C.Cir.2006) (“We have conducted our review de novo because the district court did not determine whether the classified material would be *471 helpful to the defendants under the Yunis I standard, but rather stated only that it was not subject to disclosure under Brady v. Maryland”). For example, during a pretrial conference on December 17, 2007, counsel for El-Hindi asked the court: “The FISA and CIPA information, Judge, we were talking about if there were any parts of that that were exculpatory, that was going to be reviewed by the Court. And has the Court reviewed that material?” The court answered, “I can only say what I’ve said. The government understands its obligation to ascertain and produce exculpatory material.” This answer alludes to Brady and not Yunis, though the question by counsel was couched in terms of exculpation only. In an order denying defendants’ requests to review CIPA and FISA materials, the district court stated that after its review, the classified record revealed that “[t]here was nothing exculpatory; nothing, indeed, that would have been at all helpful to the defendant or his attorneys.” The former “exculpatory” standard related to Brady, and the latter “helpful” standard related to Yunis. This order had no citations to Yunis, but the alternative phrasing was squarely in line with Yunis.
The “favorable” materiality standard of Brady is much more difficult to satisfy than the “relevant and helpful” standard of Yunis. All Brady evidence that is “favorable” would be “relevant and helpful” under Yunis, but not all evidence that is “relevant and helpful” would be favorable. “To be helpful or material to the defense, evidence need not rise to the level that would trigger the Government’s obligation under Brady v. Maryland.” United States v. Aref, 533 F.3d 72, 80 (2nd Cir.2008) (emphasis added); see Mejia, 448 F.3d at 456-57 (“While Brady information is plainly subsumed within the larger category of information that is ‘at least helpful’ to the defendant, information can be helpful without being ‘favorable’ in the Brady sense.”). Simply stated, evidence that needs to be disclosed under Brady would also need to be disclosed under Yunis, but not the other way around. Even assuming that the district court improperly applied the Brady, rather than the Yunis, standard, under de novo review, we find that this error is harmless.
When reviewing a district court’s decision to withhold information under CIPA, this court is placed in a somewhat unfamiliar posture. Rather than neutrally deciding disputes with an open record based on the adversarial process, we must place ourselves in the shoes of defense counsel, the very ones that cannot see the classified record, and act with a view to their interests. Mejia, 448 F.3d at 458 (“[T]he defendants and their counsel, who are in the best position to know whether information would be helpful to their defense, are disadvantaged by not being permitted to see the information — and thus to assist the court in its assessment of the information’s helpfulness.”). Acting as if we were in essence standby counsel for the defendants, we must determine what may be “relevant and helpful” to them. This is not a position that we relish, yet it is required by CIPA, as interpreted by Yunis and its progeny. And, after a review of the entire record with respect to the claims concerning classified information by the defendants, we find that there was nothing “relevant and helpful to the defense.” Yunis, 867 F.2d at 623. We can take the first two Yunis factors as satisfied — the information is relevant, and the government’s claim of privilege is color-able. However, the third factor is not satisfied. Similar to the record in Mejia, we “conclude that [the classified evidence] ‘falls far short’ of the ‘helpful or beneficial character’ necessary to meet the threshold showing for overcoming the privilege.” *472 Mejia, 448 F.3d at 456. Defendants’ claim with respect to section 4 of CIPA is without merit.
C. Ex Parte Hearings Before and During Trial
Defendants object to the government’s having met ex parte with the trial judge over two dozen times before and during the trial. Defendants are correct that section 4 of CIPA does not explicitly provide for ex parte hearings. Section 4 states: “The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone.” 18 U.S.CApp. 3 § 4 (emphasis added).
However, every court that has considered this issue has held that CIPA permits ex parte hearings. While section 4 does not expressly provide for ex parte hearings, “[i]n a case involving classified documents, ... ex parte, in camera hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information.” Klimavicius-Vilona, 144 F.3d at 1261; see United States v. Campa, 529 F.3d 980, 995 (11th Cir.2008) (observing that “[t]he right that section four confers on the government [to seek deletion or substitution] would be illusory if defense counsel were allowed to participate in section four proceedings because defense counsel would be able to see the information that the government asks the district court to keep from defense counsel’s view”). We agree. Further, though section 4 does not directly mention ex parte hearings, section 6 does: “Within the time specified by the court for the filing of a motion under this section, the United States may request the court to conduct a hearing” that would be held in camera.
The purpose of CIPA is to provide a means for the courts to oversee the government’s authority to delete evidence from discovery. To permit defense counsel to participate in such a hearing would frustrate the aim of CIPA. To the extent that the defendants are asserting that the government is limited to written submissions and affidavits to be considered in camera, rather than an ex parte hearing, such an argument would raise form over function, to the detriment of the defense. The district court’s role in determining whether any classified information is “relevant and helpful” could only be aided — for the benefit of the defense — through the court asking probing questions of the government, rather than relying only on written submissions. Limiting the district court to written submissions would unnecessarily hamper this vital function of the district court in CIPA proceedings.[1] We should stress that the district court also held ex parte hearings with defense counsel in order to learn about their theories and prepare for ex parte hearings with the government.
Defendants object, more specifically, to the fact that a number of ex parte hearings were conducted during the trial. Section 6 of CIPA provides that “Where *473 the United States’ motion under this subsection is filed prior to the trial or pretrial proceeding, the court shall rule prior to the commencement of the relevant proceeding.” However, based on our review of the classified record and the sealed transcripts of these ex parte hearings, we agree with the government that the purpose of these ex parte hearings during trial was “simply to remind the district court of the terms of its prior rulings under CIPA concerning the disclosure of classified information, and to alert it to the fact that certain areas of cross-examination could implicate such rulings.” United States Br. at 84 n. 14. We also note that the district court did not issue any rulings or orders in court based on these ex parte hearings. Defendants’ claims with respect to ex parte hearings are without merit.
D. Security Clearances
Defense counsel assert that, though they submitted security clearance applications well before trial, the government never processed their applications. By failing to process the applications, defendants assert, the government was able to ensure an ex parte audience with the district court, thereby denying the defense an opportunity to participate in the CIPA process. Defendants are mistaken. Even if counsel had been cleared, under the provisions of CIPA, they still would not have been able to participate in the classified discovery process and ex parte hearings.
The possession of a security clearance only becomes relevant after the district court determines, in accordance with section 4, that any classified information is discoverable. “If ... the Court decides that the information is not discoverable at all, Defendant is not entitled to production of the information, regardless whether his counsel is willing to submit to security clearance procedures.” United States v. Abu-Jihaad, No. 3:07-CR-57, 2007 WL 2972623, at *2 (D.Conn. Oct. 11, 2007).
Because there was no classified information deemed discoverable, a clearance would not have entitled the defense to see any of the information. In hindsight, it is rather easy for us to review the record and find that because the district court correctly decided that no classified information should be discoverable under section 4, the decision of the government to decline to process defense counsel’s security-clearance applications created no error. However, if the district court had determined that some classified information was discoverable at some late junction in the proceedings, then security clearances would have become urgently necessary, and the government would have needed, on an expedited basis, to process the clearances. In such a case, a government decision not to process clearances at all could result in delays in the trial or affect the ability of defense counsel to represent their clients. The decision to never even bother processing the clearances could rest on an inappropriate sense of predetermination of what the district court would do. Simply processing the applications early on— whether they are ever used or not — and holding the final grant of clearance in abeyance pending the court’s determinations, would not make the government susceptible to “graymail.”[2] As the govern *474 ment states numerous times, a clearance by itself does not entitle defense counsel to view any documents. If the district court determines that no evidence is discoverable under section four, the clearances would not be used. If the district court determines that evidence is discoverable under section four, then the final clearance could be issued, and cleared counsel could timely review the documents to prepare a defense.
However, in this case, we agree with the district court that “[w]ith or without [any later-obtained] clearances, [defense counsel] could not have participated in the ex parte proceedings regarding classified information. Nothing in CIPA opens the door to such proceedings simply because a defendant’s attorney has been cleared to see classified information.” Because no classified information was deemed discoverable under section four, a security clearance would not have entitled defense counsel to any information. This claim is without merit.
E. Foreign Intelligence Surveillance Act
Though the government stated that it would not introduce any FISA-derived evidence at trial, the defense filed a motion to compel disclosure of such information. The government stated that the United States Attorney General had signed a declaration stating that “disclosure [of FISA material] or an adversary hearing would harm the national security of the United States.”
Following an in camera review of the FISA materials, the district court denied the defense motion for disclosure:
The defendants made their instant request for disclosure in conjunction with their demand for suppression. That request, if read narrowly and literally, is likewise moot, as there is not now and may never be a review of the lawfulness of any FISA-derived evidence. Nonetheless, viewing their demand as one for discovery on whatever basis might be available to them, I have reviewed the Acting Attorney General’s affidavit with an eye to any other possible basis for disclosure, including the Brady doctrine. Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963).
On review of the classified materials submitted under seal for in camera review, I have no doubt that the Attorney General’s declaration is well-taken. The FISA-related materials contain considerable operational and technical information [much of it required by the statute] about how FISA orders are implemented. Were that information to become known, the ability to use those operational methods and technical means could be impaired, with potential adverse consequences on the government’s ability to obtain useful foreign intelligence information, and, in turn, on national security. In addition, I see nothing in those materials that comes within the government’s Brady obligations, or otherwise could properly provide a basis for granting the defendants’ motion for disclosure.
The defendants assert on appeal that the district court’s denial of their motion to *475 compel disclosure of FISA material did not comport with the due-process requirements of 50 U.S.C. § 1806(g), which states: “If the court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure.” (emphasis added).
The district court appears to have considered disclosure of FISA-derived information — -as it did with respect to CIPA information — at least in part through the lens of Brady materiality. In denying the motion, the judge stated, “I have, reviewed the Acting Attorney General’s affidavit with an eye to any other possible basis for disclosure, including the Brady doctrine .... In addition, I see nothing in those materials that comes within the government’s Brady obligations, or otherwise could properly provide a basis for granting the defendants’ motion for disclosure.” (emphasis added). The court references Brady, as well as other unnamed possible bases for disclosure.
Defendants claim that no appellate court “has addressed the breadth of FISA’s due process disclosure standard” and urge this court to adopt the “relevant and helpful” Yunis standard from the CIPA context, rather than the more stringent Brady standard. The United States counters that the “the Brady standard is coterminous with the requirement of due process embraced” by FISA. See United States v. Spanjol, 720 F.Supp. 55, 59 (E.D.Pa.1989) (“Thus, to the extent that Fed.R.Crim.P. 16 allows discovery ... beyond exculpatory information constitutionally mandated by Brady ... and its progeny, it is inapplicable to discovery of intelligence information collected under [FISA].”).
Without deciding which standard is appropriate, we conclude that the defendants were not entitled to receive any of the FISA-derived information. First, we agree with the district court that none of the information derived from FISA would need to be disclosed under Brady. Second, after a review of the entire record with respect to the claims concerning FISA-derived evidence, we find that there was nothing “relevant and helpful to the defense.” Yunis, 867 F.2d at 623.
III. Sufficiency of Evidence
Defendants challenge the sufficiency of the evidence underlying their convictions. Their claims are without merit.
A. Standard of Review
Reviewing a sufficiency of the evidence challenge, “this Court must determine ‘whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” United States v. Humphrey, 279 F.3d 372, 378 (6th Cir.2002) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We will reverse a conviction due to insufficient evidence only when the “judgment is not supported by substantial and competent evidence upon the record as a whole.” United States v. Barnett, 398 F.3d 516, 522 (6th Cir.2005) (emphasis added) (citation omitted).
B. The Conspiracy Charges
Count 1 of the superseding indictment alleged that from June 2004 to February 19, 2006, Amawi, El-Hindi, and Mazloum did “willfully combine, conspire, confederate and agree to kill or maim persons in locations outside of the United States, to include U.S. armed forces personnel serving in Iraq.” Count 2 alleged that from June 2004 to February 19, 2007, Amawi, El-Hindi, and Mazloum “did conspire, confederate and agree with others known and *476 unknown to the Grand Jury to provide material support and resources, knowing and intending they were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 2332 (killing of U.S. nationals).”
The distinguishing feature of a conspiracy is the agreement to violate the law. Iannelli v. United States, 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). The government need not prove that each defendant knew every detail of a charged conspiracy, but the government must prove that each defendant adopted the conspiracy’s main objective. United States v. Crossley, 224 F.3d 847, 856 (6th Cir.2000).
1.Amawi
Amawi contends that the evidence only establishes that he sought training for self-defense purposes, for reasons totally unrelated to terrorist activities, and that the government failed to show that he intended to participate in a plan to kill U.S. military personnel or provide material support to terrorists. This account is not supported by Amawi’s own words. The record contains ample evidence to support his conviction.
Amawi told Griffin, quite explicitly, that he “he wanted to go to perform Jihad against the U.S. troops overseas.” To that end, Amawi gave Griffin a number of jihadist videos that could be used for training other terrorists. Amawi also recruited Mazloum to participate in training with Griffin. Amawi’s argument that he was simply seeking training to promote his ability to defend himself is implausible in light of the skills he sought to acquire, including the construction of IEDs, suicide bomb vests, and other explosives.
2. El-Hindi
El-Hindi argues that the evidence is not sufficient to connect him to the conspiracy charges. This is not the case. El-Hindi also offered to recruit “brothers” in Michigan for jihadi training. El-Hindi, along with Amawi and Griffin, watched jihadi videos depicting the use of explosives. While watching these training videos, El-Hindi commented about the techniques and discussed ways of using them to harm American interests. El-Hindi hatched a plan to seek funding for training through a fraudulent federal grant. Perhaps most importantly, El-Hindi hosted at his home the only meeting where Griffin, Amawi, Mazloum, and El-Hindi congregated and discussed methods of carrying out their unlawful aims. At this meeting, ElHindi mentioned that he could obtain a grant for $95,000 for the purposes of the agreement. There is more than enough evidence available for a jury to conclude that El-Hindi sought to fund the operations.
3. Mazloum
Mazloum contends that any training he sought was to improve his physical fitness and develop his military training if he were ever to return to his home in Lebanon. He also asserts that the actions were protected speech under the First Amendment, as he was simply expressing his opposition to American foreign policies. The evidence tells a different story. After agreeing to undergo training by Griffin with Amawi, Mazloum stated that the “fight is in the ... land of the Army.” App. 95, Gov’t Ex. 4C, at 10-69185-2a. Mazloum asked Griffin if he had the “weapons ready” and offered to contribute money to the operation. App. 95, Gov’t Ex. 4C, at 10-69185-6a. Later, Mazloum clearly stated his interest in IED training. The record has more than enough evidence *477 to show Mazloum’s understanding of the purpose of the training.
4. The Common Plan
The defendants argue that collectively they did not share any sort of common plan: “The evidence was insufficient to prove Amawi and [the other defendants] formed an actual agreement to pursue the same criminal objective....” Amawi Br. at 23. Specifically, defendants argue that they expressed different objectives and never agreed on a single target. However, this is not the correct standard of proof. The government does not need to prove that a formal agreement to commit the same offense existed. Acts that “may reasonably be interpreted as participation in a common plan” can be used to establish an implicit agreement. United States v. Walls, 293 F.3d 959, 967 (6th Cir.2002); see, e.g., United States v. Gunter, 551 F.3d 472, 482 (6th Cir.2009) (noting that “a tacit or mutual understanding is sufficient, so long as the agreement is proven beyond a reasonable doubt”); United States v. Milligan, 17 F.3d 177, 182-83 (6th Cir.1994) (noting that “[a] conspiracy may be inferred from relevant and competent circumstantial evidence, such as the acts of the conspirators themselves”); United States v. Hughes, 891 F.2d 597, 601 (6th Cir.1990) (stating that “the existence of a conspiracy may be inferred from acts done with a common purpose”). “To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal.” United States v. Smith, 320 F.3d 647, 653 (6th Cir.2003).
On February 2, 2005, Amawi and El-Hindi, along with Griffin, met for the first time at Amawi’s home. At that point, Amawi had already recruited Mazloum to their enterprise. Amawi showed El-Hindi and Griffin jihadist videos depicting “martyrdom” operations. El-Hindi requested copies of the videos. On February 16, 2005, Griffin, Amawi, Mazloum, and ElHindi all met together to discuss various plans. At the meeting, Griffin stated that their preparation was a means to “join the brothers overseas.” This is a direct reference to joining jihadists fighting United States military forces. The training was not limited to a specific country, but rather was tailored to the specific needs of such a conflict. This meeting, where none of the attendees expressed any dissension, demonstrates a “collective venture” and more than supports the evidence needed to defeat a sufficiency challenge to the conspiracy charge. Ibid.[3]
The evidence shows that Amawi, ElHindi, and Mazloum shared an intent to engage in activities that were aimed at killing or maiming United States military personnel and that they participated in a common plan to provide material support to these activities. The government does not need to prove that all of the conspirators agreed on the same country or the same targets or the same means.
C. Explosive Device Charges Against Amawi
Count 3 charged Amawi alone with, from January 10 to January 30, 2005, *478 knowingly distributing information pertaining to the manufacture or use of an explosive device with the intent that such information be used in furtherance of an activity that constitutes a federal crime of violence, in violation of 18 U.S.C. § 842(p)(2)(A). Count 4 charged Amawi alone with, on February 6, 2005, knowingly distributing information pertaining to the manufacture or use of an explosive device with the intent that such information be used in furtherance of an activity that constitutes a federal crime of violence, in violation of the same section.
With respect to Count 3, the government introduced evidence showing that on January 30, 2005, Amawi showed Griffin a jihadist video demonstrating in detail how to build a bomb vest. While playing the video, Amawi translated the Arabic explanations for Griffin, who did not speak Arabic. On appeal, Amawi asserts that he did not show Griffin the video for educational purposes and that his failure to successfully transfer the video shows that Amawi lacked the requisite intent. Griffin testified that he watched the video in the context of compiling training materials and discussed various places to train and test the explosives. It was reasonable for the jury to conclude that watching and discussing how to apply the techniques taught in this video provided the requisite intent for what was clearly the forbidden act of distribution.
With respect to Count 4, the government introduced evidence showing that, on February 6, 2005, Amawi gave Griffin an electronic file containing a guide written in Arabic describing the process to manufacture explosives (this file was one of hundreds contained on a CD). Amawi claims that because Griffin could not understand Arabic and because the pair did not discuss this document, the requisite intent is not present. However, the evidence showed that Griffin and Amawi were pooling together documents to develop a library for jihad training. A reasonable juror could conclude that this document, even if it could not be read by Griffin, could be, and was intended to be, assembled into a collection for the benefit of jihadists.
There is sufficient evidence to support a jury verdict on Counts 3 and 4.
IV. Expert Testimony
This court reviews for an abuse of discretion whether the district court properly admitted or excluded expert testimony under Federal Rule of Evidence 702. See United States v. Bender, 265 F.3d 464, 472 (6th Cir.2001). The district court permitted Evan Kohlmann to testify on behalf of the United States but excluded Jon Alter-man and Reza Aslan from testifying on behalf of the defendants. Neither decision constituted an abuse of discretion.
A. Admission of Testimony of Government Witness
The government sought to call Evan Kohlmann, who specialized in collecting information from the internet about terrorist organizations, to testify about how terrorist organizations use the internet to recruit and train prospective jihadists. Defendants moved to exclude Kohlmanris testimony in limine. Prior to trial, the district court found that Kohlmann would be qualified to testify about how terrorists “use the internet to disseminate” the videos, the “difficulties encountered” in obtaining the videos, “the apparent purposes in creating and distributing” the videos, and “how internet users may be able to locate and access such materials.” However, the district court did not permit Kohlmann to testify “about the source, nature, and utility of the materials” because discussion of various terrorist *479 organizations (such as Al-Qaeda) that may have created such materials would be unduly prejudicial and not relevant. The court granted the defendants’ motion to exclude Kohlmann’s testimony, largely to prevent Kohlmann from testifying that the defendants viewed electronic material created by groups like Al-Qaeda.
During cross-examination by El-Hindi’s attorney, an FBI computer analyst testified that he did not find any internet history on El-Hindi’s computer that indicated that El-Hindi had visited a website that led to the bomb-vest video. The United States sought to allow Kohlmann to testify to rebut an inference that El-Hindi had never accessed the website — notwithstanding the lack of any specific internet history showing such access. Specifically, Kohlmann would testify that certain audio that was recorded during conversations between El-Hindi and Griffin was audio that was prominently played on numerous jihadist videos. In other words, the government wanted to show that even though the evidence that El-Hindi viewed the files did not appear on El-Hindi’s computer, the fact that El-Hindi was present when certain audio was being played could imply that El-Hindi watched certain terrorist videos. Kohlmann was also called to testify about how difficult it was to obtain these videos, showing the great lengths to which the defendants went in order to obtain them. The district court permitted Kohlmann to testify, finding a sufficient “nexus” between the proffered testimony and other relevant evidence, as it helped to prove defendants’ intent in obtaining these videos. However, the court said it would contain the testimony if “it start[ed] to ooze out of other directions.... I think we have enough of a nexus, and my desire is to see to it that the evidence is contained and limited.”
El-Hindi claims that Kohlmann’s testimony covered topics that the district court had previously excluded because it impermissibly “insert[ed] the specter of A1 Qaeda into the trial.” El-Hindi Br. at 30; see also id. at 32-35. The bulk of these objections occurred while the United States was qualifying Kohlmann as an expert — during this process, he referred several times to Al-Qaeda, Usama Bin Laden, Ayman AlZawahiri, and aspects of terrorist organizations in Iraq. However, there was no reference made to the jury of any connection between these known terrorists and the defendants. El-Hindi also asserts that Kohlmann was permitted to translate documents from Arabic, even though he was not established to be fluent in Arabic.
Prior to Kohlmann’s testimony, the court notified the jury that Kohlmann may refer to “Al-Qaeda or any other foreign terrorist organization” and reminded the jury that “there’s no evidence that any of these defendants sought out, communicated with any such organization, or on the other hand, that any such organization sought them out or undertook to communicate with them at any time whatsoever.” Kohlmann’s testimony focused on how the defendants would have obtained the information, not the source of the information. This fact was quite probative to show their intent as part of the conspiracy. Any allusions to Al-Qaeda or other terrorist organizations or leaders were not sufficient to result in reversible error. In light of the jury instruction and the narrow focus of what Kohlmann was permitted to testify about, we hold that the admission of Kohlmann’s testimony did not constitute an abuse of discretion.
B. Exclusion of Testimony of Defendants’ Expert Witnesses
The defendants sought to offer two expert witnesses. The first witness, *480 Reza Aslan, would have testified about the history of Islam, jihad, and the rise of modern-day jihadist social movements. The second witness, Jon Alterman, would have testified about politics and cultural norms in the Middle East, specifically focusing on attitudes towards the United States and its foreign policy. The district court granted the United States’s motion to exclude the testimony from Aslan and Alterman, reasoning that the testimony would not be relevant and would confuse the jury. The court found that “[j]ust as this case is not about ‘Terrorism’ writ large, it is not about Islam or jihadist movements generally.” Further, the testimony’s “probative value as to [Amawi’s] intent is substantially outweighed by its tendency to confuse the issues in this case.”
On appeal, defendants assert that, without the testimony of Alterman and Aslan, the defense could not explain Islamist religion and cultural norms to the jury and that the jury was thus “without the necessary knowledge to understand, let alone consider, innocent explanations for Appellants’ behavior and statements.” Further, the defendants argue that “the district court denied the defense the ability to explain to the jury the religion of Islam, to explain Middle Eastern views on the viewing of such materials, and explain that viewing such materials does not a ‘terrorist’ make.” Mazloum Br. at 39.
None of the charges in the indictment were of “terrorism” or related to any Islamist jihadist movement. The district court stressed throughout the entire trial that the defendants were not accused of terrorism, especially of the extremist Islamist variety. Testimony about Islamist and jihadist culture would not aid the jury in determining whether the defendants conspired to kill or maim Americans or provided material support to persons with such objectives outside the United States. In addition, there is a very weak link, if any, between Middle Eastern cultural norms and the relevant states of mind of the defendants with respect to the conspiracy charges. The district court’s decision to exclude Alterman and Aslan was not an abuse of discretion.
V. Denial of Motion for Continuance
This court reviews a district court’s decision whether to grant or deny a motion for a continuance for an abuse of discretion. See, e.g., Warshak, 631 F.3d at 298. “Denial amounts to a constitutional violation only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for a delay.” Ibid, (internal quotation marks omitted).
After Amawi was indicted in February 2006, the district court appointed the Federal Public Defender to represent him. Eight months later, in October 2006, the Federal Public Defender moved to withdraw, stating that Amawi did not trust him, as he was paid by the government. The district court granted the motion to withdraw on October 24, 2006, and appointed two new attorneys to represent Amawi, Bradley F. Hubbel and John Czarnecki. After Amawi complained about his representation again, on August 27, 2007, the district court appointed Elias Muawad, an Arabic-speaking attorney, to Amawi’s defense team. After further complaints, on October 18, 2007, the district court appointed William W. Swor as Amawi’s lead counsel and allowed Hubbel and Czarnecki to withdraw. Later, Amawi requested the reappointment of the Federal Public Defender after Swor could not devote substantial time to prepare his case.
On January 15, 2008, the Federal Public Defender’s office — including the Federal Public Defender himself, three assistants, *481 two research and writing specialists, an investigator, and other support staff — was reassigned to the case. Muawad continued to represent Amawi. Three days later, the Federal Public Defender moved to continue trial for 90 days. At that time, the trial was scheduled to begin about six weeks later on March 4, 2008. The Federal Public Defender stated that his team needed more time to review the voluminous record — which contained almost 200,-000 electronic files and 300 hours of recorded audio and video evidence — prior to trial. The district court denied this request to continue the case, noting that the Federal Public Defender “did do a substantial amount of work” on the case when it was initially assigned to represent Amawi. The district court remarked that, based on the projected timeline for the trial, the defense would not have to begin its case-in-chief until early June, giving counsel in effect five months from the date of the motion. In addition, Amawi’s co-defendant, El-Hindi, opposed any continuances. El-Hindi, who had been detained for almost two years at the time of trial, “vigorously complained about the continuances” and would have moved to sever his trial if an additional continuance were granted. In light of these factors, the district court denied the motion for a continuance.
On March 14, 2008, during the impanelment of the jury, the Federal Public Defender filed another motion to continue the trial until April 1, 2008, which the district court granted. After Amawi’s conviction, counsel moved for a new trial, arguing that the Federal Public Defender was denied adequate preparation time. The district court denied this motion.
The record in this case is indeed gigantic. However, in light of all of the factors in this long, complicated, and multifaceted case, it was not an abuse of discretion for the district court to deny the motion for a continuance. First, Amawi created the circumstances giving rise to his need for continuances with his repeated requests for new counsel. Second, although the Federal Public Defender was only brought back onto the case two months prior to trial, in 2006 the Defender’s office had been on the case for eight months and had had significant time to review the materials in the case. In 2008, upon its reappointment, the Defender was not starting from scratch. Second, the district court also had to consider El-Hindi’s concerns. At the time of the trial, ElHindi had been incarcerated for more than two years and adamantly opposed further continuances. If the trial were delayed any further, El-Hindi would have moved to sever his trial. The district court properly credited the need to try all of the defendants together as a reason for denying the continuance.
In any event, Amawi fails to demonstrate that “the denial resulted in actual prejudice to his defense.” Landrum v. Mitchell, 625 F.3d 905, 927-28 (6th Cir.2011); Warskak, 631 F.3d at 298. “Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefitted the defense.” Powell v. Collins, 332 F.3d 376, 396 (6th Cir.2003). Amawi argues that if his defense counsel had had more time to review the video evidence, they could have identified “irrelevant, prejudicial” evidence and sought its exclusion in limine. Amawi points to nothing specific that would have been prejudicial but rather relies on the fact that there could have been something prejudicial that could have been excluded. This is not enough. Despite the “mountains of discovery dumped at [his] feet,” it was not prejudicial to deny Amawi the chance “to *482 excavate in a mine that contained no ore.” Warshak, 681 F.3d at 299.
VI. First Amendment Jury Instruction
Prior to the close of the trial, Mazloum requested a jury instruction that stated that he could only be convicted if his conduct was not protected by the First Amendment:
The First Amendment of the United States Constitution guarantees to all persons the right of freedom of speech, right of freedom of association and the right of exercise of religion. A defendant cannot be convicted on the basis of his beliefs or the expression of them, even if those beliefs are unpopular or favor violence. You may find the defendant guilty if the government proves beyond a reasonable doubt that he committed the crimes charged in the indictment and that his conduct was not protected by the First Amendment.
The district court declined to give this instruction. However, it did instruct the jury:
Proof that people simply met together from time to time and talked about common interests, such as political views or religious beliefs, or engaged in similar conduct, is not enough to establish a criminal agreement. You may consider these things in deciding whether the government has proved an agreement, but without more, they are not enough.
On appeal, the defendants assert that the district court’s decision not to provide their requested instruction was in error. This court reviews for an abuse of discretion whether a district court properly granted or denied an instruction request. United States v. Prince, 214 F.3d 740, 761 (6th Cir.2000).
The district court’s decision to deny the requested instruction was not an abuse of discretion. First, although the conspiracy was closely related to, and indeed proved by, many of the defendants’ conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it. The requested instruction would have directed the jury to acquit the defendants, even if every element of the crime was proved beyond a reasonable doubt, if the jury made the legal judgment that the conduct was protected by the First Amendment. The requested instruction was wrong as a matter of law. See United States v. Mick, 263 F.3d 553, 569 (6th Cir.2001). Forming an agreement to engage in criminal activities — in contrast with simply talking about religious or political beliefs — is not protected speech. Second, juries can consider speech as evidence in a conspiracy. “The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.” Wisconsin v. Mitchell, 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) (citing Haupt v. United States, 330 U.S. 631, 642, 67 S.Ct. 874, 91 L.Ed. 1145 (1947)). Finally, the instruction the court provided properly informed the jury that merely talking with others about political or religious ideas, by itself, is not enough to support a conviction for the conspiracy charges. This claim is without merit.
VII. Entrapment
Following the jury’s verdict, El-Hindi moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, arguing that he was entrapped as a matter of law. El-Hindi did not present an entrapment defense during trial, and he consistently declined to inform the government whether he would present one. The district court denied this motion, ruling that ElHindi waived an entrapment defense by *483 not requesting an entrapment instruction and that, alternatively, the evidence presented on predisposition foreclosed acquittal as a matter of law. This court reviews a district court’s denial of a post-trial motion “based on the purely legal issue[ ] of entrapment as a matter of law” de novo. United States v. Al-Cholan, 610 F.3d 945, 950 (6th Cir.2010).
We reject El-Hindi’s claim. A district court can find entrapment as a matter of law where (1) the testimony and facts are undisputed; and (2) the evidence demonstrates a patently clear absence of predisposition. United States v. Clark, 957 F.2d 248, 250-51 (6th Cir.1992). During trial, all three defendants declined to assert an' entrapment defense. United States v. Carpentier, 689 F.2d 21, 27 (2d Cir.1982) (“When entrapment is asserted as a defense, the government is entitled to notice of the proposed defense so that it may offer evidence of predisposition in rebuttal.”). Thus, the government did not have the opportunity—or have the need to—present evidence to demonstrate predisposition. However, as the district court noted, the evidence is sufficient to show that El-Hindi was a willing and active participant in the conspiracy. Had the government been on notice that El-Hindi would assert an • entrapment defense, it could have easily sustained its burden of showing predisposition. This claim is without merit.
VIII. Outrageous Conduct
Following the close of trial, Mazloum moved to dismiss the indictment on the ground that Griffin’s conduct in creating a “terrorist cell” “shock[ed] the conscience of the public and should not be countenanced.” The district court denied this motion. This court reviews whether “outrageous government conduct” is a valid basis for dismissing an indictment-^-a question of law—de novo. United States v. Tucker, 28 F.3d 1420, 1421 n. 1 (6th Cir.1994).
This court has soundly rejected the “outrageous government conduct” defense, looking instead to the doctrine of entrapment to assess a defense that sounds in inducement:
[A] defendant whose defense sounds in inducement is, by congressional intent and Supreme Court precedent, limited to the defense of entrapment and its key element of predisposition. Defendants may not circumvent this restriction by couching their defense in terms of “due process” ,or “supervisory powers.” Thus, we reject as a matter of law the theory upon which defendants based their motion to dismiss without regard to the particular facts of their case and without reaching the issue of whether or not those facts can properly be characterized as “outrageous.”
Id. at 1428; see Al-Cholan, 610 F.3d at 952 (“[W]e have never applied the ‘outrageous government conduct’ defense, and have stated that ‘there are ... strong reasons for concluding that such a defense simply does not exist.’ ” (quoting Tucker, 28 F.3d at 1427)); United States v. Blood, 435 F.3d 612, 629 (6th Cir.2006) (holding “that the outrageous government conduct defense is not available where the defense is based either on a theory of government inducement ... or on a theory that the ‘undercover officer’s involvement in creating [the] crime was so significant that' criminal prosecution violates due process’ ” (citation omitted)). At bottom, this claim sounds in entrapment. Mazloum would wish, by availing himself of an outrageous-conduct defense, to allege that the government entrapped him, without opening the door to the admission of evidence of predisposition. Mazloum cannot bypass the risks inherent in our entrapment doctrine *484 simply by calling his defense “outrageous conduct.” Even if this court were to recognize this defense, for much the same reasons we rejected El-Hindi’s entrapment defense we would reject an outrageous-conduct claim on the merits.
IX. Miranda Warnings
Amawi was arrested in Jordan and was transferred to a jet that flew him to the United States. On board the jet, federal agents restrained him, blocked his view, conducted a cavity search, and photographed his body. The agents informed Amawi that he was being transported to the United States — not Guantanamo Bay — where he would face criminal charges. Agent Steven Gubanich read Amawi his Miranda rights. After Gubanich said “if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time,” Amawi interrupted the reading, stating, “I’m going to wait.” Gubanich asked Amawi if “he wanted to talk to [them] or not.” Amawi responded by asking if there was a lawyer on board the jet. Gubanich said there was no lawyer on board and finished reading Amawi his Miranda rights. Gubanich claimed Amawi’s question meant he “was undecided whether he wanted to talk to us.” After Gubanich finished reading the Miranda rights, Amawi signed the Miranda waiver form and spoke to the agents. After two hours of interrogation, Amawi asked, “[w]ill there be a lawyer?” Gubanich stated he believed Amawi was asking whether he was going to, at some point, be afforded an opportunity to speak with a lawyer. Gubanich said, “yes, there would be a lawyer made available ... through the normal legal process in the United States.” Gubanich then continued the interrogation.
Five hours later, Amawi stated “I guess I’m going to have to wait until I get a lawyer.” Gubanich interpreted this to mean Amawi no longer wished to speak with agents without an attorney and stopped the interrogation. During the nine-hour interrogation, which included breaks, Amawi made numerous inculpatory statements that the government used at trial. Amawi admitted that the computers, disk drives, and zip drives that the FBI seized in Jordan belonged to him and that everything the FBI seized from his bedroom in his Toledo apartment belonged to him.
The district court denied Amawi’s motion to suppress the statements made aboard the jet. The district court determined that Amawi’s statements did not constitute an invocation of either the right to remain silent or the right to counsel and that his waiver of rights was made knowingly and voluntarily. The district court concluded that if there were any invocation of Amawi’s right to remain silent, the invocation was conditional. That is, if an attorney was present, he would speak to an attorney first. and wait to talk to the agents; if an attorney was not present, he would not wait to talk to an attorney and instead be willing to talk to the agents right away.
■ On appeal, Amawi argues that his statement that he was “going to wait” invoked his right to remain silent and his question about whether there was “a lawyer on board” invoked his right to counsel. Amawi also asserts that Gubanich failed to clarify Amawi’s statement asserting the right to counsel. Amawi claims that Gubanich was required to clarify his ambiguous statement because it was made prior to a Miranda waiver. Amawi argues that when he said, “I’m going to wait,” and when he asked, “is there a lawyer on board,” Gubanich should have inquired to determine if Amawi did in fact want to speak. Amawi does not challenge that his later statement — “will there be a law *485 yer” — which came after two hours of interrogation, was not an invocation of his right to counsel. This court reviews the findings of fact regarding a suppression motion for clear error and the district court’s conclusion de novo. AJr-Cholan, 610 F.3d at 953.
Though this is not a run-of-the-mill Miranda case, the law controlling it is. A defendant’s invocation of his Miranda rights must be clear and unequivocal before interrogations must end. Berghuis v. Thompkins, — U.S. —, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010). This court has held that “a suspect must assert his right to remain silent with sufficient clarity that a reasonable officer would perceive it as such under the circumstances.” Franklin v. Bradshaw, 545 F.3d 409, 414 (6th Cir.2008). Stating that “I’m going to wait” and asking “is there a lawyer on board” is neither a clear nor unequivocal invocation of the right to remain silent or the right to counsel. Simply mentioning the prospect of talking with an attorney, or waiting to talk until one is present, is not sufficient to put the agent on notice that a suspect has invoked his right to remain silent. Gubanich’s interpretation of Amawi’s statements — that he was asking if he would be provided an attorney after he landed — is reasonable. This is even more reasonable in light of the fact that it seems Amawi feared he was being transported to Guantánamo Bay, where he may have thought accessing a lawyer could be difficult, especially since the arguably ambiguous remarks were made in the middle of the Miranda recitation. When he was fully warned, Amawi signed the Miranda form and talked to the agents. After Amawi made these statements, the agent was not required to halt the interrogations.
Further, we reject Amawi’s claim that the agent was required to ask clarifying questions in response to Amawi’s ambiguous statements that might have been an attempt to invoke his Miranda rights. No such requirement exists. “If a suspect, however, makes an ambiguous or equivocal reference to an attorney there is no requirement that law enforcement cease questioning.” United States v. Montes, 602 F.3d 381, 385 (5th Cir.2010) (citing Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). Amawi cites Kyger v. Carlton, 146 F.3d 374 (6th Cir.1998), to no avail. That case simply held that an officer’s response to a suspect’s ambiguous statement was “an inappropriate effort at pressuring Kyger to answer, rather than an appropriate attempt to get Kyger to clarify his response.” Id. at 379. Kyger did not hold that there was an obligation for an officer to clarify an ambiguous response. Here, the agent’s responses contained no pressure whatsoever. The district court did not err in denying Amawi’s motion to suppress.
X. Sentencing Appeal
Each defendant had a total offense level of 58. None of the defendants had any prior criminal history, though in light of the terrorism enhancement pursuant to United States Sentencing Guidelines (U.S.S.G.) § 3A1.4, each of their criminal history categories was increased to VI. Each defendant had a recommended sentence under the Guidelines of life in prison. The district court varied downward in sentencing each defendant. Amawi received a sentence of 240 months of imprisonment; El-Hindi received a sentence of 144 months of imprisonment; Mazloum received a sentence of 100 months of imprisonment. The district court denied a request to depart downward due to over-representation of the defendants’ criminal history.
*486 The United States has cross-appealed and asserted that these sentences are both procedurally and substantively unreasonable.
A. Standard of Review
This court reviews a district court’s sentencing determinations for “reasonableness.” See Pepper v. United States, — U.S.—, 131 S.Ct. 1229, 1241, 179 L.Ed.2d 196 (2011) (citing Gall v. United States, 552 U.S. 38, 49-51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). We “use an abuse of discretion standard to assess whether a sentence is unreasonable.” United States v. Christman, 607 F.3d 1110, 1117 (6th Cir.2010). A district court abuses its discretion when it imposes a sentence that is either procedurally or substantively unreasonable. Ibid.; see United States v. Hall, 632 F.3d 331, 335 (6th Cir.2011); United States v. Baker, 559 F.3d 443, 448 (6th Cir.2009) (“[W]e review a district court’s sentencing decisions ‘under a deferential abuse-of-discretion standard’ for reasonableness.” (quoting Gall, 552 U.S. at 51, 128 S.Ct. 586)).
B. Procedural Unreasonableness
“A sentence is procedurally unreasonable where a district court ... fails to consider the 18 U.S.C. § 3553(a) sentencing factors, selects a sentence based upon erroneous facts, or fails to adequately explain its chosen sentence and its deviation, if any, from the Guidelines range.” Hall, 632 F.3d at 335. The United States on appeal argues that the “sentences were therefore procedurally unreasonable because the judge failed adequately to explain them, based them on erroneous facts, and failed adequately to take into account the relevant statutory sentencing factors set out in 18 U.S.C. § 3553(a).” United States Br. at 120.
The district court held a separate sentencing hearing for each defendant over the course of two days, where numerous witnesses testified and provided information for the court to consider. The United States may disagree with the conclusions the district court drew, but it does not point out any “erroneous facts” relied on by the court. The district court accepted the presentence report’s calculations as accurate, and there is no assertion that the Guidelines were calculated incorrectly. The district court repeatedly mentioned and discussed each of the factors listed under 18 U.S.C. § 3553(a) and explained the ways in which the facts of this case caused it to vary from the Guidelines. The United States’s procedural-reasonableness argument — which it only asserts halfheartedly — is without merit. Procedurally, the sentence was reasonable. At its heart, this appeal is a challenge to the substantive reasonableness of the sentence, which we consider next.
C.Substantive Unreasonableness
“A sentence is substantively unreasonable if the district court ‘selects a sentence arbitrarily, bases the sentence upon impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor.’” Hall, 632 F.3d at 335 (quoting Baker, 559 F.3d at 448). “In assessing substantive unreasonableness [this court] look[s] to ‘the totality of the circumstances, including the extent of any variance from the Guidelines range,’ ” giving due deference to the district court’s decision. Christman, 607 F.3d at 1118 (quoting Gall, 552 U.S. at 51, 128 S.Ct. 586).
The United States contends that the sentences were “substantively unreasonable because the district judge afforded unreasonable weight to factors he *487 deemed to justify substantial deviations from the recommended guideline sentence.” We disagree. The sentence is substantively reasonable.
The government claims that the district court “either virtually disregarded or merely paid lip service to the pertinent Section 3553(a) sentencing factors.” 18 U.S.C. § 3553(a) provides:
The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the proper sentence to be imposed, shall consider—
(1) the nature and characteristics of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct....
The district court discussed and considered each factor in detail. However, the government challenges the “amount of weight [given] to [the] pertinent factor[s].” Hall, 632 F.3d at 335.
1. Nature and Characteristics of the Defendant
With respect to the nature and characteristics of the offense, the government points to Amawi’s poor behavior while in pretrial confinement, which resulted in disciplinary actions. The district court remarked that there was “simply not any justification” for Amawi’s behavior. The government claims that this poor behavior, which the court recognized, cuts against the district court’s determination that “on balance” Amawi’s history and characteristics did not “justify a life term of imprisonment.” The government asserts that the district judge gave “little rationale to justify his substantial variance from the recommended Guideline sentence, and certainly none that would overcome the seriousness of Amawi’s offenses and his poor disciplinary record while awaiting trial.” For Mazloum, the government claims that the district court should not have given much weight to the fact that Mazloum assumed certain responsibilities, such as working toward a degree and running a business. The government raises no argument with respect to the nature and characteristics of El-Hindi’s history.
These arguments are quite weak and selectively cherry-pick and focus on very small segments of the voluminous record that show aspects of the defendants’ nature and characteristics that cut against varying downward. There was more than enough evidence adduced during the sentencing hearings that would reflect positively on the nature and characteristics of the defendants’ history to counsel a downward variance. The district court’s consideration of these factors, and the weight attached to them, did not constitute error.
2. The Need To Afford Adequate Deterrence To Criminal Conduct
The government cites earlier statements made by the district court regarding Amawi recruiting Mazloum into the conspiracy and Amawi’s extensive library of jihadist materials as evidence that “the judge’s decision that a 60 percent reduction in the recommended Guideline sentence would adequately deter Amawi was plainly unreasonable.” United States Br. at 132. With respect to Mazloum, the government claims that the district judge *488 simply stated “his belie[f] that this [sentence] will adequately deter the defendant.” Id. at 133 (internal quotation marks omitted). However, the government notes that the district court also stated that it feared that Mazloum’s zeal “might someday flare back up.” Id. at 134 (internal quotation marks omitted). With respect to El-Hindi, the government claims that the district court did not discuss at all the issue of deterrence. The district court also gave some weight to the age of the defendants. At the time of the sentencing, Amawi was 29, El-Hindi was 46, and Mazloum was 28. The government asserts that this was in error, as “nothing suggests that Amawi’s zeal for engaging in violent jihad decreased as he aged. Consequently, his age upon release should have had no bearing on specific deterrence.”
We disagree. First, with respect to Amawi, it vyas reasonable for the district court to credit the fact that if he serves his entire sentence, he would have spent nearly half of his remaining life in prison when released. Further, .it was reasonable for the district court to conclude that the lifetime of supervised release included in the sentence would be additional deterrence. The district court had no doubt that “Amawi will be very closely monitored and supervised and his conduct will be very closely overseen and that will provide the protection that the government seeks in its request for a lifetime term.” The district court did not merely recite the sentencing factors or pay lip service to them.
Second, with respect to Mazloum, the district court certainly expressed concerns about Mazloum perhaps engaging in criminal conduct in the future but, weighing all the circumstances, determined that this factor did not counsel against a variance downwards. The court’s explanation on this element was thoughtful and well-reasoned.
Third, with respect to El-Hindi, the district court stated that his sentence would serve as a “signpost” warning others not to engage in such conduct.
[Although I do not think that a sentence of this length is necessary to either incapacitate or to deter Mr. ElHindi from further criminal conduct as to either of these sets of crimes of which he stands convicted; nonetheless, I think that it is appropriate for the government to ask me and for me to respond to that request to try and communicate through this sentence, and I think this does so, to those who might be tempted to take their opposition to our government and its policies, whatever those policies may be, whether they’re domestic policies or foreign policies, but for those who might be tempted to take the first steps in the path towards generating a risk of harm to our fellow citizens or to anyone else....
The court’s consideration of deterrence was stated succinctly and was not unreasonable.
Though these reasons may be unsatisfactory to the government, the district court gave due attention and reasonable consideration to whether their sentences would provide adequate deterrence to future criminal conduct.
3. Need to Avoid Sentencing Disparities
The need to avoid sentencing disparities is really the gravamen of the government’s appeal. The government cites a number of recent cases with much heavier sentences involving convictions of this type. In United States v. Abu Ali a divided panel of the Fourth Circuit reversed the district court’s decision to sentence the defendant — who had a total offense level of 49 and a criminal history category of VI — to 360 months for violating, inter alia, *489 18 U.S.C. §§ 2339A and 2339B. 528 F.3d 210, 258 (4th Cir.2008). The court found that “[b]ased on the foregoing circumstances of this case, we find the district court’s significant downward deviation not to be justified.” Id. at 269. In United, States v. Mustafa, the Second Circuit upheld a sentence of life imprisonment for violating, inter alia, 18 U.S.C. §§ 2339A, 2339B, 842, and 956. 406 Fed.Appx. 526, 528 (2d Cir.2011). Recently, in the “Millennium Bomber” case, the Ninth Circuit en banc, in a split decision, reversed the district court’s 264-month sentence of Ahmed Ressam for violating, inter alia, 18 U.S.C. §§ 2332b and 842, finding that the sentence was too light. United States v. Ressam, 679 F.3d 1069, 1071-72 (9th Cir.2012) (en banc) (“Upon our review of the record, we conclude that the district court abused its discretion in sentencing Ressam as it did. As a result, we conclude that the sentence imposed by the district court was substantively unreasonable.”). The government claims that the “resulting disparity [between the sentence of the three defendants here and] with these other sentences, plainly contravened the objective of Section 3553(a)(6).” The government also challenges the failure of the district court to explain the disparity between the sentence of Amawi (240 months), El-Hindi (144 months), and Mazloum (100 months).
The district court did not create unwarranted disparities. Though these other cases all involve terrorist-related offenses, they bear significant factual dissimilarities that do not create any reversible tension with the district court’s downward variance.
Our case is not on the same order of magnitude as Ressam, where the so-called “Millennium Bomber” was apprehended trying to enter the United States with a vehicle full of explosives. Certainly Amawi conspired to obtain explosives, but he never managed to obtain them. The defendant in Abu Ali was convicted of charges stemming from his affiliation with an Al-Qaeda terrorist cell in Saudi Arabia. The government adduced no proof that Amawi was affiliated with Al-Qaeda or any other terrorist group. The defendant in Mustafa admitted to killing people and associating with terror groups. There was absolutely no evidence introduced at trial that any of the defendants actually killed anyone. Ressam, Abu Al% and Mustafa are sufficiently different that the district court was not unreasonable. We also note that Mustafa, in upholding a life sentence, did not hold that this sentence was always appropriate in such cases. In light of the fact that these other cases involved much more serious conduct, the district court properly weighed factors with respect to avoiding sentencing disparities.
In addition, having reviewed the classified record that was before Chief Judge Carr, in light of the § 3553(a) factors, we have no additional reasons to find error in the sentences given to the defendants.
XI. Denial of Amawi’s Motion For A New Trial
After the close of trial in December 2008, Amawi filed, a motion for new trial pursuant to Fed.R.Crim.P. 33. In the motion, Amawi contended that the district court erred in denying his request to review evidence relating to a Syrian with whom Amawi had communications concerning the acquisition of explosives. The district court denied the motion, stating that the court had “undertaken a review of the classified information presented ex parte in light of the defendant’s contentions in his new trial motion. Nothing was disclosed there that, by hindsight, should have been disclosed to defense counsel.”
On June 13, 2011, Amawi filed another motion for a new trial. Amawi contended *490 that his defense team had learned of the whereabouts of the Syrian, allegedly named Hosam Tarsha, after speaking with someone who may have been Tarsha’s mother. Amawi’s motion sought to compel the government to furnish information, including classified information, concerning Hosam Tarsha, and any facts that it might possess relating to Amawi’s contacts with him.
The district court directed Amawi to supplement the motion with an affidavit demonstrating that he had contacts with the Syrian and how those conversations could have generated any exculpatory information that the government could possess. Amawi declined to provide such an affidavit, fearful that it would be incriminating. The district court denied the motion on the merits, finding that the “newly discovered evidence” did not support the new claim that Amawi was actually only involved in a scheme with the Syrian to bilk Griffin out of money under the pretenses of assisting terrorists. The district court concluded that Amawi “produced no newly discovered evidence that ha[d] any bearing on the issues at his trial.” Finally, the district court concluded, after reviewing the government’s ex parte submissions under CIPA, that the government had not produced any “evidence that was of the slightest possible use to the defense” with respect to the Syrian or any other topic and that there was no basis for believing that the government would have “withheld information, if it had any, of any pertinence to [Amawi’s] contacts with the Syrian.”
We agree with the district court’s denial of Amawi’s motion for a new trial on the merits. Amawi’s motion was vague, speculative, and only established that someone, who may be named Hosam Tarsha, was in Syria. Nothing in the motion warranted granting a new trial. Further, based on our independent review of the classified record, we conclude that there is no evidence that would have been “relevant and helpful” to the defense with respect to the Syrian. Yunis, 867 F.2d at 622. The district court did not abuse its discretion in denying Amawi’s motion for a new trial.
XII. Conclusion
All opinions and judgments of the district court are AFFIRMED.

. This conclusion is further supported by Federal Rule of Criminal Procedure 16(d), which grants the district court “broad authority ... to regulate discovery[,] including] the power to hold hearings.” United States v. Campa, 529 F.3d 980, 995 (11th Cir.2008) (citing Fed. R.Crim.P. 16(d)). CIPA does not purport to limit this authority. Ibid. Because CIPA also expressly excludes defendants from proceedings addressing the discoverability of confidential information, logic dictates that a district court not only has the authority to hold a hearing for this purpose, but also the ability to do so ex parte. Ibid.; see also Aref, 533 F.3d at 81; Klimavicius-Viloria, 144 F.3d at 1261.

. Tenet v. Doe, 544 U.S. 1, 11, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005) (“Forcing the Government to litigate these claims would also make it vulnerable to 'graymail,’ i.e., individual lawsuits brought to induce the CIA to settle a case (or prevent its filing) out of fear that any effort to litigate the action would reveal classified information that may undermine ongoing covert operations. And requiring the Government to invoke the privilege on a case-by-case basis risks the perception that it is either confirming or denying relationships *474 with individual plaintiffs.”)- "Our role [on] appeal is circumscribed. We are not asked, and we have no authority, to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security. Similarly, neither the prosecutorial decisions in this case nor the possibility of graymail ... comes within our purview.” United States v. Abu Ali, 528 F.3d 210, 253 (4th Cir.2008) (citing United States v. Fernandez, 913 F.2d 148, 154 (4th Cir.1990)).

. Defendants also repeatedly mention that this was "the first and only time” all three of them met, Amawi Br. at 7, arguing that the lack of any additional group-wide gatherings renders insufficient the government’s evidence of a conspiracy, id. at 30. We have made clear, however, that the crime of conspiracy requires neither a minimum period of duration nor a minimum number of meetings. See United States v. Warshak, 631 F.3d 266, 309 (6th Cir.2010) (noting that “the temporal scope of a conspiracy is not an essential or material element of the charge” (internal quotation marks omitted)). Thus, the limited nature of defendants' contemporaneous interactions has no bearing on their guilt.