# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3237
_____

United States of America

*Plaintiff - Appellee*

v.

Kalolo Nathaniel Iu

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: October 19, 2018
Filed: March 6, 2019

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Kalolo Nathaniel Iu was convicted of one count of sexual abuse, committed in Indian Country, in violation of 18 U.S.C. §§ 2242(1) and 1153, and one count of attempted witness tampering, in violation of 18 U.S.C. § 1512(b)(1), related to an

assault on his girlfriend. The district court[1] sentenced Iu to 210 months imprisonment on the sexual abuse count and 120 months imprisonment on the witness tampering count, with the sentences running concurrently, and a 5-year period of supervised release. Iu appeals his convictions, asserting that insufficient evidence supported both verdicts, that the district court erroneously admitted hearsay testimony, and that a fatal variance from the Indictment occurred as to the witness-tampering charge. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On the evening of November 20, 2016, Iu got into an altercation with Brittany Bad Hand, the mother of three of his children, and with whom he had been in a relationship on and off for a number of years. The altercation began while Iu and Bad Hand were running errands together; Iu was driving and Bad Hand was a passenger in the vehicle. Iu and Bad Hand got into in a verbal dispute about each other's fidelity, which turned physical when Iu punched and spit on Bad Hand and Bad Hand slapped Iu. After the physical altercation, Iu drove the vehicle to the graveyard where his mother was buried. While standing at his mother's grave, Iu told Bad Hand that he blamed Bad Hand for a previous incarceration that made him unable to attend his mother's funeral and that he had "picked out" a burial plot for Bad Hand. Iu again hit Bad Hand and kicked her while she was on the ground covering her face.

Iu then drove the two back to Bad Hand's residence. Iu spent the night, sleeping with Bad Hand in the living room; the boyfriend of Bad Hand's brother, who was also staying at the apartment, slept in one bedroom and Bad Hand's children slept in the other. At one point during the night, Iu attempted to have sex with Bad Hand, but Bad Hand resisted and told him "no." The following morning, Bad Hand moved

[1]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

into the bedroom while Iu got the children ready for school so that they would not see the obvious facial injuries to their mother, including a badly swollen and bruised eye. After the children left, Iu went into Bad Hand's bedroom and climbed on top of Bad Hand in the bed. Bad Hand tried to push Iu off and told Iu "no" and "stop." Iu then tried to remove Bad Hand's underwear, and when Bad Hand resisted, Iu stated that Bad Hand let "everybody else hit it," but "just say[s] no to him." Bad Hand stopped resisting, and Iu had sex with her.

After Iu had sex with Bad Hand, Iu left the residence. Bad Hand immediately contacted authorities. Bad Hand spoke with responding officers before traveling to the hospital where she underwent a sexual assault exam. The exam documented injuries to Bad Hand's body, including a black eye and contusions behind both ears, on both arms, on her left leg, on her right shoulder, and on her hips. Bad Hand also provided a statement that Iu had physically and sexually assaulted her and spoke with a domestic violence advocate and a Federal Bureau of Investigation Special Agent.

Iu was subsequently arrested on a federal sexual abuse warrant. After handcuffing Iu and reading him his <u>Miranda</u> rights, officers placed Iu in the back of a patrol car. Despite being handcuffed, Iu was able to maneuver his cell phone out of his pocket and place a call to Bad Hand. During the call, Iu told Bad Hand to drop the charges and to tell law enforcement that she had lied about the assault. After this conversation, Bad Hand called the FBI Special Agent and stated that she wanted to drop the charges against Iu. Iu was later indicted for an additional charge of attempted witness tampering.

While Iu was in custody awaiting trial, he was recorded on four separate phone calls, three with Bad Hand and one with his sister, discussing efforts to get Bad Hand to recant her story. During the call with his sister, Iu asked her to encourage Bad Hand to tell the prosecutor that she lied and that she would not testify against Iu. Iu's sister followed Iu's instructions and later spoke with Bad Hand. During his phone

conversations with Bad Hand, Iu continually encouraged her to speak with the investigator hired by the defense to investigate the claims against Iu. Iu was recorded telling Bad Hand to "make it happen," asking how things had gone in speaking to the investigator, and stating "that's all I needed to know" when told that Bad Hand spoke with the defense investigator and identified Bad Hand's brother's boyfriend as the person who had given her a black eye. The calls also recorded Bad Hand expressing her fear that she could get in trouble after speaking to the defense investigator and Iu telling her "Don't be scared," and to stay strong. The government also introduced a letter Iu wrote to Bad Hand while in custody, which he addressed to "Fat Ass" and in which he stated his displeasure with being in custody and his view that there was "a lot more [Bad Hand] could do to help [Iu] not feel this way, but [Bad Hand's] love always had limits."

The matter proceeded to a jury trial. At trial, Bad Hand testified that, on November 20, 2016, Iu repeatedly struck her, including around the face, and that she woke up the following morning with a black eye that was so badly bruised and swollen that she could not open it. On cross-examination, when asked about her inconsistent statement to the defense investigator, Bad Hand said she lied about another person hitting her because she wanted to keep her family together. The government then called the FBI Special Agent who had interviewed Bad Hand shortly after the assault. She testified, over Iu's hearsay objection, about the statements Bad Hand made detailing the incident and identifying Iu as the person who assaulted her. The district court overruled the objection and allowed the testimony as offered not for the truth of the matter asserted, but as evidence of prior consistent statements. At the close of the evidence, Iu moved for a judgment of acquittal as to the sexual abuse count. Although Iu did not make a similar motion on the witness-tampering count, the district court sua sponte considered a motion for judgment of acquittal on that count as well. The district court denied both motions. The case proceeded to the jury, which returned a guilty verdict on both counts. The district court sentenced Iu to 210 months imprisonment on the sexual abuse count and 120 months imprisonment

on the witness tampering count, to run concurrently, and a 5-year period of supervised release. This appeal follows.

## II.

Iu asserts that the government failed to introduce sufficient evidence to support the jury's guilty verdicts of both sexual abuse and attempted witness tampering. We review a claim regarding the sufficiency of the evidence supporting a criminal conviction de novo, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Matthews, 761 F.3d 891, 893 (8th Cir. 2014) (quoting United States v. Morris, 723 F.3d 934, 938 (8th Cir. 2013)). Reversal is warranted only where the Court concludes that "no reasonable jury could find all the elements beyond a reasonable doubt . . . ." United States v. Wiest, 596 F.3d 906, 910 (8th Cir. 2010). The same standard of review applies where the defendant did not move for a judgment of acquittal, but the district court sua sponte considered it. See United States v. Ramos, 852 F.3d 747, 752-53 (8th Cir. 2017).

## A.

Iu first asserts that insufficient evidence supports his sexual abuse conviction. To support a conviction for sexual abuse under 18 U.S.C. § 2242(1), the government was required to prove that Iu "knowingly . . . cause[d Bad Hand] to engage in a sexual act by threatening or placing [Bad Hand] in fear." Iu asserts that the government failed to prove that he "knowingly" caused Bad Hand to submit to sexual activity out of fear. In essence, Iu asserts that because Bad Hand stopped resisting and let Iu have sex with her, Iu could not have known that Bad Hand was acquiescing out of fear; Bad Hand's "subjective fears and reasons for engaging in intercourse" cannot prove Iu acted knowingly. We disagree.

-5-

The jury heard significant evidence from which it could make permissible inferences that Iu's behavior was aimed at frightening Bad Hand to the point that she acquiesced to sexual activity with him. See United States v. Bloom, 482 F.2d 1162, 1163-64 (8th Cir. 1973) (per curiam) (discussing the permissible inferences that a jury may draw and a reviewing court's obligation to view all evidence, including all reasonable inferences, in the light most favorable to the verdict). This evidence included that Iu had a long history of physically assaulting Bad Hand, including one assault while Bad Hand was pregnant that resulted in Iu's previous incarceration; that the evening before he had sex with her, Iu spit on, punched, and kicked Bad Hand, and took her to his mother's grave, where he told Bad Hand he had a burial plot for her picked out; that the previous evening's abuse had occurred following allegations by Iu of Bad Hand's past infidelity; that Iu had a history of assaulting Bad Hand when he suspected she had been unfaithful; that Bad Hand and Iu engaged in a physical struggle when Iu tried to remove Bad Hand's underwear; that immediately before Bad Hand stopped resisting, Iu made a comment about Bad Hand allowing other men to have sex with her but not allowing Iu to have sex with her; and Bad Hand's testimony that she acquiesced to sex with Iu because she was afraid Iu would hit her again. This evidence is sufficient to allow the jury to infer that Iu put Bad Hand in fear of further physical abuse, that he knew she was in fear, and that she acquiesced to sexual activity because she was in fear of further physical injury.

While the jury could have conceivably believed Iu's version of events and reached the opposite conclusion, where faced with conflicting hypotheses as to what occurred, the jury is entitled to credit one over the other. See, e.g., United States v. Serrano-Lopez, 366 F.3d 628, 634 (8th Cir. 2004) ("If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction. [T]he government's evidence need not exclude every reasonable hypothesis of innocence." (alterations in original) (internal quotation marks and citations omitted)). Here, the jury did just that, and sufficient evidence supports the hypothesis they credited.

-6-

To the extent that Iu argues that circuit precedent demonstrates the insufficiency of the evidence against him, we disagree. In particular, Iu relies on United States v. Fool Bear, 903 F.3d 704 (8th Cir. 2018), where we vacated a conviction for aggravated sexual abuse based on the insufficiency of the evidence. There, the Court determined that evidence of past physical abuse was insufficient to show that the victim was in fear of sexual abuse during the incident giving rise to the charges, particularly where the victim did not testify that, due to past physical abuse, she was afraid during the sexual act and no evidence showed that the previous physical abuse was ever tied to or occurred in conjunction with the sexual abuse. Id. at 712-13.

In contrast, Bad Hand offered testimony discussing her fear of Iu, how physical abuse by Iu was often followed by sexual activity, how allegations of infidelity were often the catalyst for physical confrontations, and how she was afraid Iu was going to hit her again and only acquiesced to sex to avoid another beating. These facts are sufficiently distinct to render Fool Bear's reasoning inapplicable to this case. Similarly, that cases such as United States v. Betone, 636 F.3d 384, 388 (8th Cir. 2011) (defendant blocked exit and told victim trying to leave was "the worst thing [he] can do") and United States v. Johns, 15 F.3d 740, 742-43 (8th Cir. 1994) (defendant manipulated victim with spiritual teachings and told her spirits would harm her loved ones if she did not submit to defendant's sexual advances), involved more overt threats does not undermine the jury's conclusion here that, when viewed in total, Iu's behavior put Bad Hand in fear, caused her to engage in a sexual act with him, and Iu was aware of Bad Hand's fear and acquiescence.

The jury heard sufficient evidence from which it could conclude, beyond a reasonable doubt, that Iu knowingly placed Bad Hand in fear so that she engaged in a sexual act with him. We affirm Iu's conviction for sexual abuse.

B.

Iu similarly asserts that insufficient evidence supports his attempted witness tampering conviction. Under 18 U.S.C. § 1512(b)(1), Iu could be found guilty of attempted witness tampering if he "knowingly use[d] intimidation, threaten[ed], or corruptly persuad[ed Bad Hand] or attempt[ed] to do so, or engage[d] in misleading conduct toward [Bad Hand] with intent to influence, delay, or prevent the testimony of [Bad Hand] in an official proceeding." To sustain a conviction, the government was thus required to prove two elements: (1) that Iu knowingly engaged in such activity, that is, he had "consciousness of wrongdoing" and (2) that Iu intended the actions to influence Bad Hand's testimony. See United States v. Craft, 478 F.3d 899, 900 (8th Cir. 2007) (quoting Arthur Anderson LLP v. United States, 544 U.S. 696, 706 (2005)).

Again, Iu takes aim at the requisite mental state, asserting that because he did not believe he assaulted Bad Hand, he was not pressuring her to change her story and lie about what had occurred; he was merely encouraging her to tell the truth, which he believed exonerated him. This argument is without merit. The jury heard sufficient evidence from which it could conclude, beyond a reasonable doubt, that Iu knowingly attempted to persuade Bad Hand to lie to investigators about the assault. The jury was entitled to infer that the statements Iu made to Bad Hand while handcuffed in the patrol car—"You tell them you lied," "This shit is going to fuck up my life and make me look like a sex offender for the rest of my life, you better tell 'em you're fucking bullshitting them," and "Baby you gotta get me out of this." —were not merely pleas that Bad Hand tell the truth and instead were attempts to coerce, pressure, or intimidate her into lying to protect Iu. Especially given the long history of Iu's abusive behavior toward Bad Hand, the jury was entitled to infer that Bad Hand understood these statements as threatening. The jury was also entitled to consider, as evidence of his consciousness of guilt, statements that Iu made to both

-8-

Bad Hand and his sister, urging Bad Hand to recant her story because of the negative consequences the allegations had on Iu.

Sufficient evidence allowed the jury to credit the prosecution's theory that Iu's statements were unlawful attempts to influence or prevent Bad Hand's testimony by threatening, coercing, or persuading her into recanting her story and telling a dishonest and inconsistent account of the assault rather than, as Iu suggests, efforts to encourage her to be honest about the assault. See Serrano-Lopez, 366 F.3d at 634 (allowing jury to credit either of two conflicting hypotheses). This conclusion is bolstered by the jury's conclusion that Iu sexually abused Bad Hand. Iu's theory of innocence on the witness-tampering charge is related to his argument that he did not knowingly sexually abuse Bad Hand. Because the jury concluded that Iu knowingly committed sexual abuse, his theory that he was encouraging Bad Hand to tell the truth about the assault in untenable. Considered in its entirety, the evidence was sufficient to allow a jury to conclude, beyond a reasonable doubt, that Iu was guilty of attempted witness tampering. We affirm Iu's conviction for attempted witness tampering.

III.

Iu next asserts that the district court erroneously admitted hearsay into evidence. Iu challenges three statements—Bad Hand's statements to the FBI Special Agent during an interview the same day as the sexual abuse; Bad Hand's statement to law enforcement officers who first arrived at Bad Hand's residence; and Bad Hand's statement to her brother's boyfriend that Iu sexually assaulted her—but acknowledges that he only objected to one of the challenged statements at trial. We review the district court's ruling on Iu's objection for an abuse of discretion and will reverse "only if an error was not harmless." United States v. White Bull, 646 F.3d 1082, 1091 (8th Cir. 2011). We review the statements to which Iu did not object for plain error. Id. "For relief under plain error review, [a defendant] must show (1) the

district court committed an error, (2) the error is clear or obvious, and (3) the error affected his substantial rights." Id.

Iu argues that the district court erred in allowing, over his objection, the FBI Special Agent to recount Bad Hand's statements providing a detailed account of the incident and identifying Iu as her attacker. Iu presented as a defense theory that the sexual act was consensual and Bad Hand had fabricated the sexual abuse claim, an argument premised on the statement Bad Hand made to a defense investigator identifying Bad Hand's brother's boyfriend, who was staying at Bad Hand's apartment, as the person who gave her a black eye. On cross-examination, Iu's counsel questioned Bad Hand about the inconsistencies in her statements. On redirect, the government asked Bad Hand when she had made the statement that another individual assaulted her. Bad Hand stated that she had made the statements to a defense investigator after she had provided her original statements, including one to the FBI Special Agent. The government then called the FBI Special Agent and asked her to recount the contents of Bad Hand's statement, including Bad Hand's identification of Iu as the person responsible for the assault. Iu raised a hearsay objection, which the district court overruled by ruling that the testimony was admissible as a prior consistent statement under Fed. R. Evid. 801(d).

Rule 801(d)(1)(B) addresses the admissibility of prior consistent statements, specifically as they relate to claims of fabricated testimony or charges, allowing the introduction of evidence "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." Further, "[u]se of a prior consistent statement to rehabilitate the credibility of a witness who has been impeached by a prior inconsistent statement is appropriate when the statement contextualizes, clarifies, or amplifies the meaning of the witness's testimony or inconsistent statement." United States v. Cotton, 823 F.3d 430, 437 (8th Cir. 2016).

-10-

The district court did not abuse its discretion in allowing the challenged testimony; it was admissible under Fed. R. Evid. 801(d)(1) as a prior consistent statement offered specifically to rebut the defense theory that Bad Hand had fabricated her claim of sexual abuse. It helped demonstrate that Bad Hand's account of what happened during the assault changed only much later in the process, after speaking with the defense investigator, and that immediately following the assault, Bad Hand identified and detailed Iu's involvement as the perpetrator. The testimony was also admissible to rehabilitate Bad Hand's credibility because it shed light on the context in which Bad Hand made the inconsistent statement—to the defense investigator, following repeated attempts by Iu to convince Bad Hand to change her story and provide a statement that would exonerate Iu. We find no merit to Iu's contention that the district court erred in allowing this testimony.

Iu also argues that the district court plainly erred in allowing the law enforcement officer who originally responded to the scene to share Bad Hand's account of the incident and in allowing Bad Hand's brother's boyfriend to recount Bad Hand's statement that she had been sexually assaulted by Iu. We conclude that this unobjected-to testimony is also admissible under the Federal Rules of Evidence as prior consistent statements. The district court thus committed no error in allowing the introduction of the statements at trial.

IV.

Finally, Iu asserts that his conviction for attempted witness tampering should be vacated because a fatal variance occurred between that offense as charged in the Indictment and the evidence introduced at trial, arguing that the court erroneously allowed the jury to consider as substantive evidence of guilt communications that occurred after the offense date charged in the Indictment. Iu challenges the introduction of recorded phone conversations between Iu and Bad Hand and Iu and his sister that occurred between March 27, 2017 and April 7, 2017, and a letter from

Iu to Bad Hand dated April 11, 2017. All communications undisputedly occurred after the March 10, 2017 offense date listed in the Indictment returned on April 5, 2017.

"[A] variance occurs when the essential elements of the offense set forth in the indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Fiorito, 640 F.3d 338, 350 (8th Cir. 2011) (alteration in original) (quoting United Sates v. Gavin, 583 F.3d 542, 547 (8th Cir. 2009)). But "[a] variance between the indictment and proof at trial requires reversal of a conviction only if the variance actually prejudiced the defendant. The primary consideration in this determination is whether the indictment fully and fairly apprised the defendant of the charges he or she must meet at trial." United States v. Thomas, 791 F.3d 889, 897 (8th Cir. 2015) (quoting United States v. Begnaud, 783 F.2d 144, 148 (8th Cir. 1986)). "Whether a variance exists, and, if so, whether that variance prejudiced [the defendant] are questions of law that we review de novo." United States v. Stuckey, 220 F.3d 976, 979 (8th Cir. 2000).

While "[a] verdict cannot be based on an act that could have occurred after the return of the indictment," United States v. Plenty Arrows, 946 F.2d 62, 65 (8th Cir. 1991), the record reflects that evidence of Iu's conversations with Bad Hand and his sister was not offered as substantive evidence of Iu's guilt on the witness-tampering count. The jury instructions specifically stated the date on which the witness tampering allegedly occurred, March 10, 2017, and the jury heard the phone call Iu made to Bad Hand on that date. Further, during closing arguments the government referenced the later calls and letters only as evidence of consciousness of guilt, not as an independent basis to find Iu guilty of attempted witness tampering. We conclude that a variance warranting reversal of Iu's witness-tampering conviction did not occur because the later-made statements and letter were not offered as substantive evidence of Iu's guilt, and Iu "could reasonably have anticipated the evidence

-12-

presented at trial from the indictment." <u>United States v. Duke</u>, 940 F.2d 1113, 1120 (8th Cir. 1991) (quoting <u>United States v. Shyres</u>, 898 F.2d 647, 653 (8th Cir. 1990)).

V.

For the foregoing reasons, we affirm.

_____