NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0052n.06

No. 21-5194

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jan 27, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| PRINCE BIXLER, | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |
| | ) | |

Before: SUTTON, Chief Judge; GUY and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Following a seven-day trial, a jury found Defendant Appellant Prince Bixler guilty of sex trafficking, drug trafficking, witness tampering, and possessing firearms as a felon. On appeal, Bixler raises a plethora of challenges to his sex trafficking and witness tampering convictions, sentencing enhancements, and order of restitution. For the following reasons, we affirm.

**I.**

From 2013 to 2018, Bixler operated a prostitution ring in Lexington, Kentucky. Bixler found and recruited destitute women with pre-existing drug addictions to prostitute themselves for his financial benefit. He lured them in with promises of free shelter, food, and drugs, and once they became entirely dependent on him, Bixler demanded they work as prostitutes to pay off their "accumulated debts." Bixler manipulated their drug addictions, controlled their drug supply, and used intimidation and violence to ensure that the women complied.

Following a lengthy investigation, Bixler was arrested on March 28, 2018. The government subpoenaed several women, including Adrienne Ratliff and Amie Payton, to appear before a grand jury. Bixler's history with Ratliff and Payton was representative of how he treated his other victims: he initially provided them with "free" shelter and drugs, but quickly turned violent and abusive. Bixler incessantly called Ratliff and Payton in the days leading up to their testimony. He guilted Ratliff for betraying him and hurting him, stating "Oh, but you told them you'd testify against me[.] . . . Do you know how bad that fucking hurt me?"; "You know, I have kids too."; and "[Y]ou don't even have a conscience, do you? . . . [I]t's just so fucked up that you don't even have a conscience man. . . . Because I keep sitting here thinking about, you know, God damn, does she even have a conscience about the shit that she just done." Ratliff repeatedly lied to Bixler and said she would not testify for fear that he would "yell at [her] and just go off until he got what he wanted out of [her]." Despite Bixler's pleas, Ratliff testified against him before the grand jury.

In addition, Bixler instructed Payton not to talk to a court-appointed attorney and "just tell the truth." Bixler also called Payton over thirty times the day before her scheduled grand jury appearance. The next morning, Payton injected heroin before arriving at the courthouse and refused to testify. Payton stated, "I was afraid to [talk]" and "I didn't want Prince to be mad at me either." She also stated that she would rather go to jail for six months than testify against Bixler. The court subsequently appointed her counsel, and she returned the following month to testify against Bixler before the grand jury.

On September 19, 2019, the grand jury charged Bixler with four counts of sex trafficking, two counts of witness tampering, one count of using facilities in interstate commerce to manage the trafficking scheme, six counts of drug distribution, and three related firearms offenses.

2

The matter proceeded to a jury trial in September 2020. At trial, the government presented testimony from three sex trafficking victims.[1]

The first victim to testify, Kaitlyn Moore, recalled meeting Bixler while homeless and unemployed. Moore had been living with her boyfriend until he overdosed and went to jail. She then moved into a rehabilitation facility but subsequently relapsed and absconded from the facility. Moore eventually found herself homeless, without any personal belongings, and shoplifting to afford her drug habit.

Shortly thereafter, Moore met Bixler at a hotel and received free heroin from him. That same night, Bixler suggested Moore could make money through Backpage.com—a website commonly used for prostitution. Bixler told her how to set up an account, paid for the user fees, and helped her solicit clients. Bixler also purchased a hotel room for her dates. Moore testified that, in the beginning, she made "easily a thousand dollars" a day and continued receiving free heroin from Bixler.

Eventually, however, Bixler told Moore that she owed a significant debt for her living expenses, the hotel, and the drugs. Moore testified that she felt obligated to repay the debt by prostituting herself. She stated, "Over time, I started to feel like it really wasn't, like, so much a choice as where kind of I had to do it for fear. But I didn't want to struggle, and I didn't want to have nothing, and it was no longer an option at one point in time. Like, I didn't—I had to do it." She also stated that "once [she] started to do more dope, [she] would need more dope to not be sick, and that cost money too." Moore further testified that Bixler regularly carried guns and was

---

[1] The government also presented testimony from a fourth alleged victim. However, at the close of the government's case in chief, the district court found insufficient evidence of sex trafficking as to the fourth victim and granted in part Bixler's motion for judgment of acquittal.

prone to violence. According to Moore, she once "got smacked" for letting one of the other women into her hotel room. Moore testified that she feared Bixler and felt like she could not leave.

The second victim to testify, Savannah Godown, recalled having a romantic relationship with Bixler. For the first few months, Bixler was "great" to Godown. He supplied her with free crack cocaine daily and provided her with several free apartments. Eventually, however, Bixler turned violent. Godown testified that Bixler hit her "weekly," and that he once "beat [her] with an air mattress pump," and kicked a door in and chipped her tooth.

Shortly thereafter, Bixler moved Godown into a hotel room and she became involved with Backpage.com. Bixler imposed a strict set of rules for Godown; he controlled the information she posted in her ads, the nature of her clientele, and when she could leave the hotel rooms. If Godown disobeyed the rules, Bixler would "beat [her] up for it." Bixler also deputized Godown to help run the operation. Bixler would instruct Godown to "work the phone," pay for the other women's hotel rooms, and collect their profits to give to Bixler. If Godown did not comply, Bixler would again "put his hands on [her]." After approximately four years, Godown grew "tired of being beat on" and left.

The third victim to testify, Savannah Evans, told a similar story to Moore. Like Moore, Evans met Bixler while homeless and addicted to heroin. Evans testified that Bixler moved her into his house and began fronting her heroin. Eventually, she began prostituting herself through Backpage.com to repay her debt. Bixler and his girlfriend, Crystal Rowe, controlled Evans' account; they took photographs of her, posted ads for her services, and paid for the advertisement fees. Bixler even drove Evans to outcalls, or calls at the client's location instead of at the hotel. After she finished a date, Evans gave all the money she earned to Bixler, who provided her with food, shelter, and drugs.

4

Evans stayed at Bixler's house full time, leaving only for calls. Evans testified that she feared Bixler and felt like she could not leave. Bixler controlled not only her Backpage.com account, but also her heroin supply. He initially provided her heroin on a daily basis, but Evans eventually had to beg Bixler for heroin. Evans testified that the erratic intake caused withdrawal symptoms. According to Evans, heroin withdraw is "like the flu. . . . Diarrhea, and your body hurts, it aches. You feel really anxious and scared and worried about where you're going to get more from." Evans stated that those symptoms would subside immediately after using heroin. Evans also testified that Bixler hit her on three separate occasions when she tried to leave, and that she saw Bixler hit at least four other women as well.

After hearing this and other evidence, the jury found Bixler guilty of sex trafficking, drug trafficking, witness tampering, and the related offenses. The district court subsequently sentenced him to 432 months' imprisonment and ordered him to pay $333,270 in restitution to Moore, Godown, and Evans. This appeal followed.

## II.

Bixler first challenges the district court's grant of the government's pre-trial motion to preclude evidence of his alleged victims engaging in prostitution both before and after their involvement with him.

In "criminal proceeding[s] involving alleged sexual misconduct," Federal Rule of Evidence 412 bars any evidence "offered to prove that a victim engaged in other sexual behavior." Fed. R. Evid. 412(a)(1). However, "not all evidence implicating a victim's past sexual activity falls within Rule 412(a)." *United States v. Kettles*, 970 F.3d 637, 642 (6th Cir. 2020). Rule 412 does not prohibit "evidence whose exclusion would violate the defendant's constitutional rights." Fed. R. Evid. 412(b)(1)(C). Bixler seizes upon this exception and argues that prohibiting evidence of his alleged victims' past sexual behavior violated his Sixth and Fifth Amendment rights.

First, Bixler contends that the district court violated his Sixth Amendment confrontation rights by curtailing relevant cross-examination testimony from which the jury could have assessed the women's biases or motives to testify. Bixler asserts that the women may have testified against Bixler in exchange for not being prosecuted for prior acts of prostitution. This argument lacks merit.

The Sixth Amendment guarantees criminal defendants the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). However, the Confrontation Clause requires only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Boggs,* 226 F.3d at 736. Thus, trial judges retain broad discretion to impose reasonable limits on cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). When a trial court limits cross-examination pertaining to a witness's motive, bias, or prejudice, we must decide "whether the jury was otherwise in possession of sufficient information concerning formative events to make a discriminating appraisal of a witness' motives and bias." *United States v. Fields*, 763 F.3d 443, 464 (6th Cir. 2014) (citation omitted).

The district court here permitted Bixler to elicit evidence of the women's criminal histories and their involvement with the underlying investigation. For example, Moore testified that she twice avoided arrest on outstanding warrants—once at the time of Bixler's arrest and once a year later with the help of the same investigating detective. Godown similarly testified that the government reduced a felony robbery charge to a misdemeanor shoplifting charge after she spoke with the investigating detective on the underlying case. In addition, all of the women admitted to

purchasing, possessing, and using illicit drugs. Therefore, the jury possessed sufficient information concerning the women's motives to testify, which arose from the prospect of potential punishment and not from the nature of their conduct.

Bixler next argues that the district court violated his Fifth Amendment due process rights by precluding evidence that bore directly on the essential element of force or coercion. Bixler asserts that evidence of prior prostitution suggested the women participated in commercial sex acts on their own volition, and not at his behest. This argument is likewise unavailing.

Although "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense . . . [it] does not require the admission of irrelevant evidence (or other types of evidence whose relevance is outweighed by other important considerations)." *United States v. Beavers*, 756 F.3d 1044, 1052 (7th Cir. 2014) (internal citations omitted). We agree with the great weight of authority from our sister circuits that prior acts of prostitution are irrelevant to sex trafficking charges under § 1591(a). *See, e.g.*, *United States v. Carson*, 870 F.3d 584, 595-96 (7th Cir. 2017); *United States v. Gemma*, 818 F.3d 23, 34 (1st Cir. 2016); *United States v. Lockhart*, 844 F.3d 501, 510 (5th Cir. 2016); *United States v. Roy*, 781 F.3d 416, 420 (8th Cir. 2015); *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015); *United States v. Valenzuela*, 495 F. App'x 817, 819-20 (9th Cir. 2012).

Prior acts of prostitution lead only to improper character inferences and are not relevant to proving sex trafficking charges under 18 U.S.C. § 1951(a). This evidence had no bearing on whether Bixler forced or coerced them into prostitution on the *particular occasions* alleged in the indictment. Bixler argues that evidence of prior prostitution would demonstrate the women's propensity to engage in prostitution, which, in turn, would negate their testimony that Bixler forced them into a life of prostitution. However, this is exactly the type of evidence proscribed by Federal

7

Rules of Evidence 412 and 404(b). *See United States v. Givhan*, 740 F. App'x 458, 464 (6th Cir. 2018) (citing *United States v. Mack*, 808 F.3d 1074, 1084 (6th Cir. 2015)) (holding that evidence of prior prostitution is not admissible to prove consensual prostitution on a different occasion).

Furthermore, Bixler cannot show prejudicial error because the parties did, in fact, elicit evidence of prior acts of prostitution, notwithstanding the district court's order. Bixler testified that he met Moore through Backpage.com, where he responded to her advertisement for sex. Godown likewise testified that she worked on Backpage.com before meeting Bixler. In addition, Evans testified that she occasionally posted advertisements for sex independent of Bixler.

Accordingly, Bixler cannot demonstrate that the district court committed any error, let alone prejudicial error, in granting the government's motion in limine.

### III.

Second, Bixler challenges the district court's denial of his pre-trial motion to preclude the testimony of addiction specialist Dr. Kelly Clark.

Federal Rule of Evidence 702 requires expert testimony to be both reliable and helpful for "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a)-(d). Bixler challenges both requirements. He argues that Clark could not provide reliable testimony because she never examined the victims in this case. He also argues that Clark did not testify on matters "beyond the ken of the average juror," and thus "invaded the province of the jury" in determining the ultimate issue at trial—whether Bixler coerced the victims to engage in commercial sex acts. Appellant Br. 21-22. We review the district court's admission of expert testimony for an abuse of discretion. *United States v. Amawi*, 695 F.3d 457, 478 (6th Cir. 2012).

At trial, Clark testified about the physical and psychological impacts of drug dependency, addiction, and withdrawal. Clark differentiated between physical dependency as the body's adjustment to the presence of drugs, and drug addiction as a "chronic brain disease" that affects

the user's impulse control and judgment. Trial R. 216, Page ID#: 2940, 2943. She explained that withdrawal results from the body's readjustment to the absence of drugs. She described withdrawal as "very, very painful," and listed common symptoms as nausea, diarrhea, sweating, shaking, and drooling. *Id.* at Page ID#: 2943. She stated that "people can't function when their bodies" go through withdrawal. *Id.* Clark noted that anyone can become dependent on drugs and experience withdrawal, but only those addicted to drugs lose control when the drugs are withheld. According to Clark, those struggling with addiction initially reuse drugs to "chas[e] feeling good," but, as the addiction cycle continues, they reuse drugs to escape the sickness that comes from withdrawal. *Id.* at Page ID#: 2950.

This kind of testimony does not require review of case-specific facts. *See* Fed. R. Evid. 702 advisory committee's note ("[I]t might . . . be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case."). Instead, Clark's testimony helped the jury contextualize the women's vulnerabilities and understand the power Bixler held over them—subjects that likely are beyond an ordinary juror's knowledge or experience. *See* Patrick Eoghan Murray, *In Need of a Fix: Reforming Criminal Law in Light of a Contemporary Understanding of Drug Addiction*, 60 UCLA L. Rev. 1006, 1025 (2013) ("For a judge or jury to get inside the mind of a drug addict requires understanding th[e] mysterious and self-destructive compulsion [to consume drugs] that has no analog for nonaddicts."). Accordingly, the district court did not abuse its discretion by allowing Dr. Clark to testify as an expert regarding drug dependency and addiction.

## IV.

Third, Bixler contends that the government violated his equal protection rights by using a peremptory challenge to strike the only black member of the venire.

The Equal Protection Clause prohibits a party from using peremptory challenges to exclude members of the venire on account of their race. *See Batson v. Kentucky*, 476 U.S. 79 (1986). In evaluating a *Batson* challenge, the district court must follow a three-step process. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). First, the court must determine if the opponent of the peremptory challenge has made out a prima facie case of racial discrimination (step 1). Second, if the opponent establishes a prima facie case, the court must then determine if the proponent has presented a race-neutral explanation (step 2). Third, if the proponent tenders a race-neutral explanation, the court must ultimately decide whether the opponent has proved purposeful discrimination (step 3). *Id.* Notably, "the ultimate burden of persuasion . . . rests with, and never shifts from, the opponent of the strike." *Id.*

*Step 1.* A party's use of a peremptory challenge to strike the only prospective black juror is "more than sufficient to establish a prima facie case of intentional discrimination." *United States v. Mahan*, 190 F.3d 416, 425 (6th Cir. 1999). Bixler averred, and the government did not dispute, that the stricken juror, Juror 23, was the sole black juror on the panel. Thus, we must move to step 2.

*Step 2.* The proponent's explanation "need not be particularly persuasive, or even plausible, so long as it is neutral." *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999). An explanation is "neutral" if it is based on something other than the race of the juror. *Hernandez v. New York*, 500 U.S. 352, 360 (1991). Here, the government argues that the peremptory strike was based on Juror 23's acquaintance with Bixler, namely, that her family or friends knew Bixler. Finding that the government met its burden, we turn now to step 3. *See United States v. Lawrence*, 735 F.3d 385, 444 (6th Cir. 2013) (finding that a juror's familial connection to the defendant "is facially reasonable and does not suggest discriminatory intent").

*Step 3.* When the proponent presents a neutral explanation, "the question . . . boils down to whether [the opponent] established by a preponderance of the evidence that the peremptory strikes were intentionally discriminatory." *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996). The district court's decision on the ultimate question of discriminatory intent is a finding of fact entitled to "great deference on appeal." *Hernandez*, 500 U.S. at 364. We accordingly review for clear error. *Tucker*, 90 F.3d at 1142.

In this case, the district court found no discriminatory intent. The court noted that Juror 23 was the only juror who "had heard of Prince Bixler," and that she gave conflicting information "on how she heard." Juror 23 initially indicated that, three or four years prior, she heard a family member mention "Prince Bixler" in passing. Juror 23 later indicated that she heard his name through a mutual family friend, not a family member, and named the specific friend on the record. In addition, Juror 23 was the only juror with prior knowledge of Backpage.com. Under these circumstances, we cannot find that the district court clearly erred in overruling Bixler's *Batson* challenge.

## V.

Fourth, Bixler argues that the district court erred in denying his motion for a continuance based on news coverage of a local rally against sex trafficking to occur later that same day.

Trial courts retain broad discretion on matters of continuances. *Morris v. Slappy*, 461 U.S. 1, 11-12 (1982). An abuse of discretion occurs only when the court unreasonably and arbitrarily "'insist[s] upon expeditiousness in the face of a justifiable request for delay.'" *Id.* (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *United States v. Wirsing*, 719 F.2d 859, 866 (6th Cir. 1983) (citation

11

omitted). We also look to whether the defendant suffered any prejudice as a result of the denial. *Id.*; *United States v. Martin*, 740 F.2d 1352, 1360 (6th Cir. 1984).

Minutes before the start of voir dire, Bixler moved to continue his trial for an unspecified period of time to avoid any potential prejudice from a local rally against "either human trafficking or sex trafficking" scheduled for later that same day. Trial R. 213, Page ID#: 1904. Bixler worried that prospective jurors "may have heard reports" on the news that morning, and selected jurors could hear about it on the news that night. *Id.* He argued that the rally attendees would be protesting the same conduct of which he was accused, and thus, publicity of the rally could prejudicially pervade the courtroom and impact his ability to have a fair trial. The district court denied the motion, assuring the parties that it would "carefully voir dire" the jury pool of any predispositions and warn the selected jury "to avoid any news concerning th[e] case, and . . . the subject matter of the case."

During voir dire, the court inquired whether the prospective jurors had any knowledge of the case or any preconceived opinions as to Bixler's guilt. None of the jurors indicted any knowledge of the case. Instead, all the jurors expressed their willingness to decide the charges against Bixler solely on the evidence presented at trial and to presume Bixler's innocence unless proven guilty. Defense counsel specifically inquired whether the prospective jurors had seen any news stories or accounts about commercial sex trafficking. None of the jurors answered affirmatively, and neither party challenged any juror for cause on that basis. Throughout the trial, the district court properly admonished the jury to avoid reading, watching, or listening to any coverage of the case, and required any juror inadvertently exposed to such information to convey that fact to the court. Under these circumstances, we cannot find that the unbeknownst sex trafficking rally prejudicially affected the juror pool.

Accordingly, the district court did not abuse its discretion in denying Bixler's motion for a continuance.

**VI.**

Fifth, Bixler challenges the sufficiency of the evidence supporting his convictions for sex trafficking and witness tampering. Where, as here, a defendant properly preserves his claims of insufficient evidence, we review those claims *de novo*. *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015). In evaluating the claims, we must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Conatser*, 514 F.3d 508, 519 (6th Cir. 2008) (citation omitted).

**A.**

To support a conviction for sex trafficking under 18 U.S.C. § 1591(a)(1), the government must prove that Bixler (1) recruited, enticed, harbored, transported, provided, obtained, or maintained a person; (2) knowing that force, threats of force, coercion, or any combination of such means would be used; (3) to cause the person to engage in a commercial sex act. Bixler challenges only the second element, arguing that the government failed to present sufficient evidence of "force" or "coercion."

"Coercion" includes "threats of serious harm" and a "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." 18 U.S.C. § 1591(e)(2)(A)-(B). "Serious harm" means

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the

same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

18 U.S.C. § 1591(e)(5). It can include physical and psychological harm incurred from severe drug withdrawal. *See Mack*, 808 F.3d at 1081-83.

In *Mack*, the defendant targeted women with pre-existing drug addictions and used those addictions to coerce them into prostitution. *Id.* at 1082. The defendant initially supplied "free" drugs to the women, which in turn exacerbated their addictions and resulted in a high, fictitious drug debt. *Id.* at 1081-82. When he abruptly cut them off and demanded payment, the women felt compelled to engage in commercial sex acts "to avoid the physical and psychological harm of heroin and cocaine withdrawal." *Id.* at 1082. One woman testified that "when she did not prostitute herself, she would get sick from lack of heroin. Without it, she would sweat, vomit, shake, and kick her legs uncontrollably." *Id.* Under these circumstances, this court found sufficient evidence of a "coercive and, at times, physically abusive atmosphere in which the victims felt compelled to prostitute themselves." *Id.* at 1081.

*Mack* is controlling here. Bixler similarly exploited his victims' drug addictions and withdrawal symptoms by carefully controlling their access to drugs. Bixler gave the women presumptively free drugs and enticed them into codependent relationships. Once he gained their complete obedience and loyalty, Bixler demanded the women engage in prostitution for his financial benefit. Bixler took salacious photos of them, posted advertisements on Backpage.com, and set the prices for their services. Bixler psychologically manipulated the women by withholding drugs until after their dates. He also used intimidation and violence to ensure the women met their daily quotas. He then kept all the money earned; using the profits to repay their fictious debts. Viewing this evidence in the light most favorable to the government, a reasonable

14

jury could have found that Bixler forced, threatened, or coerced the women to engage in prostitution.

Bixler also argues that the district court should have found Evans incompetent to testify and stricken her testimony after she admitted to using heroin on the morning of trial. However, "[a] witness under the influence of drugs is competent to testify unless he or she is so impaired that he or she cannot coherently respond to questioning." *United States v. Frezzell*, 793 F. App'x 133, 136 (3rd Cir. 2019) (quoting 98 C.J.S. Witnesses § 115 (2019)). That was not the case here. The district court determined that Evans "had recollection, she's had narration, she seems to understand the oath, she says she doesn't remember when she doesn't remember." Trial R. 214, Page ID#: 2460-61. The court accordingly concluded that Evans was competent to testify. Thus, Bixler's argument goes to the weight and credibility of her testimony—a question "particularly suited to the jury," not this court. Fed. R. Evid. 601, Advisory Committee Notes; *see United States v. Moreno*, 899 F.2d 465, 469 (6th Cir. 1990).

B.

To support a conviction for witness tampering under 18 U.S.C. § 1512(b)(1), the government must prove that Bixler (1) knowingly intimidated, threatened, or corruptly persuaded; (2) with the intent to influence, delay, or prevent; (3) the testimony of any person in an official proceeding. Bixler challenges only the first element, arguing that the government failed to present sufficient proof of intimidation, threats, or corrupt persuasion where he told the women to "tell the truth."

We have consistently upheld convictions for witness tampering in the absence of directly threatening language. *See United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002); *United States v. Carson*, 796 F. App'x 238, 251 (6th Cir. 2019). The key inquiry is whether the evidence

could have been interpreted as "threatening in nature or intent." *Carnes*, 309 F.3d at 956 (internal quotations and citation omitted). This inquiry recognizes that "otherwise encouraging language can become a threat . . . when issued by a long-time abuser." *Id.* at 957 (internal quotations omitted).

The evidence produced at trial demonstrated that Bixler had a long-standing pattern of threatening and abusing Ratliff and Payton. In the days leading up to their grand jury appearances, Bixler incessantly called and delivered messages to deter them from testifying. For example, Bixler confronted Ratliff and guilted her for betraying him. Bixler also conveyed that, if the roles were reversed, he would "fight with" her rather than testify against her. In particular, Bixler threatened: "No, when I get the fuck in front of you, I'm going to cuss your ass out, I might even slap your God damn brains out. But at the end of the day – I wouldn't tell the motherfucker nothing." Gov't Ex. 12G, 01:43-3:26. Ratliff understood these messages as attempts to pressure or intimidate her into lying to protect him.

Bixler similarly confronted Payton, telling her that the government wanted to "conquer and destroy" him by "fucking [him] with all [his] loved ones [and the people he] takes care of . . . or the people that [he would] do anything for, so once they turn on [him], [he's] sitting in jail with nothing." Gov't Ex. 13A, 00:28-01:07. Based on Bixler's tone and conduct, Payton believed Bixler "was mad at [her]" and did not want her to testify before the grand jury. To avoid angering Bixler, Payton used heroin on her way to the courthouse and refused to talk at the first grand jury. Payton stated that she would rather go to jail for six months than testify against him.

Under these circumstances, the jury could reasonably infer that Bixler attempted to corruptly persuade the women and prevent them from testifying before the grand jury. This is

especially true "given the long history of [Bixler's] abusive behavior toward [Ratliff and Payton]." *United States v. Iu*, 917 F.3d 1026, 1032 (8th Cir. 2019).

**VII.**

Finally, Bixler challenges the application of seven sentencing enhancements and the district court's calculation of restitution. When evaluating the district court's application of the Sentencing Guidelines, we review factual findings for clear error and mixed questions of law and fact *de novo*. *United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012). "A finding is clearly erroneous where, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*

A.

We will first address Bixler's argument that the record did not adequately support six different sentencing enhancements.

First, Bixler objects to the district court's application of a four-level enhancement for "knowingly caus[ing] another person to engage in a sexual act—by using force against that other person; or by threatening or placing that other person in fear [of] death, serious bodily injury, or kidnapping." 18 U.S.C. § 2241(a); *see* U.S.S.G. § 2A3.1(b)(1). Several women testified at trial that Bixler frequently used violence to ensure they met call quotas. Bixler even admitted that he "put [his] hands on women"; in particular, he testified that he hit Godown and "struck" Evans for stealing money. Therefore, the district court did not err in applying the use of force enhancement.

Second, Bixler objects to the district court's application of U.S.S.G. § 3B1.1(a). Under section 3B1.1(a), the district court must apply a four-level enhancement if the defendant organized or led any criminal activity that involved five or more participants. A review of the record shows that Bixler headed an extensive criminal enterprise that spanned several years and involved at least eight participants whom he deputized to recruit women, create advertisements, arrange hotel

rooms, collect profits, and deliver drugs. Therefore, the record amply supported application of the leadership enhancement.

Third, Bixler objects to the district court's application of a two-level enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. The district court determined that Bixler's convictions for witness tampering supported an enhancement for obstructing justice. The court found that Bixler "specifically talked about trafficking with respect to Adrianne Ratliff." These findings were supported by the record.[2]

Fourth, Bixler objects to the district court's application of an eight-level enhancement for threatening to cause physical injury to a person. *See* U.S.S.G. § 2J1.2(b)(1)(B). However, Bixler's argument is belied by a recorded phone call between himself and Ratliff, in which he threatened to "slap [her] God damn brains out." Gov't Ex. 12G, 01:43-3:26.

Fifth, Bixler objects to the district court's drug quantity calculation under U.S.S.G. § 2D1.1(c)(5). Section 2D1.1(c)(5) provides that drug trafficking offenses involving at least one kilogram of heroin require a base offense level of 30. A review of the record shows that Bixler distributed heroin to at least nine people over the course of two years. For instance, Bixler sold Holly Falls thirty grams of heroin; Jessica Martin ten grams of heroin; and Amy Bailey sixty grams of heroin. In addition, Bixler supplied Evans with heroin daily for two and a half years, an approximate total of seven hundred fifty grams, and Caudill with two grams of heroin daily for a couple months. Accordingly, the record sufficiently supported the district court's drug quantity calculation.

---

[2] The district court alternatively found that Bixler presented perjurious testimony at trial. However, given our affirmance of the enhancement on other grounds, we need not address Bixler's challenge to this alternative theory of application.

18

Finally, Bixler objects to the district court's application of a two-level enhancement for an offense involving three to seven firearms. *See* U.S.S.G. § 2K2.1(b)(1)(A). However, Bixler admitted that he owned three firearms recovered from his residence and garage. Therefore, the district court did not err in applying the firearm enhancement.

B.

Bixler next argues that the district court impermissibly "double counted" in applying multiple Sentencing Guidelines provisions for the same conduct.

Double counting occurs only "when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999). "[N]o double counting occurs if the defendant is punished for distinct aspects of his conduct." *United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010). Even where double counting occurs, it is not necessarily impermissible. *Farrow*, 198 F.3d at 194. For instance, "we allow double counting where it appears that Congress or the Sentencing Commission intended to attach multiple penalties to the same conduct." *Id.* (citing *United States v. Johnson*, 22 F.3d 106, 108 (6th Cir. 1994)).

Bixler identifies three alleged instances of double counting. First, he asserts that the district court improperly considered his use of force to determine his base offense level and to apply a four-level enhancement under § 2A3.1(b)(1). U.S.S.G. § 2G1.1(a) provides the base offense level for sex trafficking convictions. However, when the offense involves aggravated sexual abuse or sexual abuse, the cross-reference in U.S.S.G. § 2G1.1(c)(1) provides that the district court should instead apply U.S.S.G. § 2A3.1. Section 2A3.1(b)(1) provides for a four-level enhancement if the offense involved the former—aggravated sexual abuse under section 2241(a) or (b). *Id.* at § 2A3.1(b)(1). Based on the plain language of the Guidelines, the Sentencing Commission

intended for the entirety of § 2A3.1, including any enhancements, to apply following the application of the cross reference. *See* U.S.S.G. § 1B1.5(a); *United States v. Kizer*, 517 F. App'x 415, 420 (6th Cir. 2013) (finding that "the Sentencing Commission must have intended to punish defendants in this way using both the cross reference and the enhancement."). Therefore, the district court's application of the use of force enhancement did not constitute impermissible double counting.[3]

Second, Bixler asserts that the district court improperly considered the victims' drug addictions both as an element of the offense and to increase the offense level under § 3A1.1(b)(1). Under section 3A1.1(b)(1), the district court must apply a two-level enhancement "if the defendant knew or should have known that a victim of the offense was a vulnerable victim." A "vulnerable victim" means one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* at § 3A1.1 cmt. n.2. The application notes caution that the vulnerable victim enhancement cannot be applied "if the factor that makes a person a vulnerable victim is incorporated in the offense guideline." *Id.* However, the district court recognized this at sentencing and imposed the enhancement based on factors other than the women's drug addictions. For example, the court also considered their criminal histories and economic dependency on Bixler. Therefore, the district court's application of the vulnerable victim enhancement did not constitute impermissible double counting.

Third, Bixler asserts that the district court improperly considered his attempts to influence grand jury testimony both as an element of the offenses and to increase the offense level under § 3C1.1. However, this argument is expressly foreclosed by the application notes. The application notes allow the obstruction of justice enhancement to apply "where there is a separate count of

---

[3] We note that U.S.S.G. § 2G1.1 imposes a base offense level of 34 for convictions under 18 U.S.C. § 1591(b)(1), and thus, any perceived error would be harmless.

conviction for such conduct." U.S.S.G. § 3C1.1 cmt. n.4; *see United States v. Pego*, 567 F. App'x 323, 330 (6th Cir. 2014). Therefore, the district court's application of the obstruction of justice enhancement also did not constitute impermissible double counting.

C.

Finally, Bixler contends that the district court erred in calculating the amount of restitution owed to Moore, Godown, and Evans. The Trafficking Victims Protection Act ("TVPA") directs district courts to order restitution for any sex trafficking offense. *See* 18 U.S.C. § 1593(a). Section 1593(b) requires the defendant to pay the victim "the full amount of the victim's losses," including "the gross income or value to the defendant of the victim's services or labor."

Bixler argues that the government did not present sufficiently reliable proof of the women's incomes, and that the court merely estimated the amount. However, the amount of restitution need not "be proven with exactitude." *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012). Determining the dollar amount of a victim's losses "will often be difficult" and "such a determination will inevitably involve some degree of approximation[.]" *Id.* (citation omitted). Thus, estimates are permitted as long as there exists some reasonable and reliable evidence of the victims' losses. *United States v. Williams*, 5 F.4th 1295, 1305 (11th Cir. 2021).

Relying on the women's trial testimony, the district court multiplied their self-reported daily earnings by the approximate number of days worked. The court found that Moore earned approximately $1,000 per day for four days, totaling a gross income of $4,000. It also estimated that Godown earned approximately $300 per day for 782 days, totaling a gross income of $234,642. It further determined that Evans earned approximately $160 per day for 591 days, totaling a gross income of $94,628. During its calculations, the court reduced the number of days

21

worked to account for sick days and ensure a conservative estimate. We find these estimates sufficiently reasonable and reliable for purposes of the TVPA.

Bixler next asserts that the court should have offset the claimed amount by the value of the items supplied to the women, including food and lodging. However, this argument disregards the plain language of the TVPA. Section 1593(b) provides that trafficking victims shall recover "the gross income or value [of their services]." "Gross income" is the "[t]otal income from all sources *before* deductions, exemptions, or other tax reductions." Black's Law Dictionary 710, 767 (7th ed. 1999) (emphasis added). Therefore, "the court was not required—or even permitted—to offset the restitution . . . by the amount [Bixler] expended on his victims' living expenses." *Williams*, 5 F.4th at 1305.

Accordingly, the district court did not err in calculating the amount of restitution owed under the TVPA.

## VIII.

For the foregoing reasons, we **AFFIRM** Bixler's convictions, sentence, and restitution owed.